**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

GREAT DIVIDE WIND FARM 2 LLC,
a Delaware corporation, and
GREAT DIVIDE WIND FARM 3 LLC,
a Delaware corporation,

       Plaintiffs,

v.

THERESA BECENTI AGUILAR,
CYNTHIA HALL, JEFFERSON BYRD,
VALERIE ESPINOZA, AND STEPHEN
FISCHMANN, in their official capacities
as the Commissioners of the New
Mexico Public Regulation Commission,

       Defendants.

No:  1:19-cv-99-JB-CG

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allco Renewable Energy Ltd. v. Mass. Elec. Co.*,
    208 F. Supp. 3d 390 (D. Mass. 2016), *aff'd*, 875 F.3d 64 (1st Cir. 2017) ..............................19

*Applied Energy Servs., Inc. v. Okla. Corp. Comm'n.*,
    31 FERC ¶ 61,313 (1985) ...........................................................................................17

*Exelon Wind 1, L.L.C. v. Nelson*,
    766 F.3d 380 (5th Cir. 2014) .................................................................................14, 19

*F.E.R.C. v. Mississippi*,
    456 U.S. 742 (1982)..................................................................................7, 8, 9, 10, 13, 14

*FLS Energy, Inc.*, *et al.*
    157 FERC ¶ 61,211 (2016) ......................................................................................17, 18

*In the Matter of the Formal Complaint of Great Divide Wind Farm 2 and Great
    Divide Wind Farm 3 Against El Paso Electric Company*,
    No. 18-00268-UT (N.M. Pub. Reg. Comm'n Nov. 7, 2018)...........................................3, 4, 15

*Great Divide Wind Farm 2 LLC and Great Divide Wind Farm 3 LLC*,
    166 FERC ¶ 61,090 (2019) ...........................................................................................4

*Grouse* Creek Wind Park, LLC,
    142 FERC ¶ 61,187 (2013) ..........................................................................................18

*JD Wind 1, LLC, et al.*,
    129 FERC ¶ 61,148 (2009), *reh'g denied*, 130 FERC ¶ 61,127 (2010) .........................17, 18

*Pub. Serv. Co. of N.H.*,
    539 A.2d 275 (N.H. 1988) .........................................................................................17

*Western Water & Power Prod. Ltd., LLC v. Pub. Serv. Co. of N.M.*,
    No. 11-00466-UT (N.M. Pub. Regulation Comm'n Aug. 3, 2016)...............................2, 3, 15

*Winding Creek Solar LLC v. Peevy*,
    293 F. Supp. 3d 980 (N.D. Cal. 2017) ........................................................................19

**Statutes**

Public Regulatory Policies Act of 1978, 92 Stat. 3117, 16 U.S.C. et seq.

16 U.S.C. § 791a ............................................................................................................... 9

16 U.S.C. § 792 ................................................................................................................. 9

16 U.S.C. § 793 ................................................................................................................. 9

16 U.S.C. § 796(17)(A) .................................................................................................. 12

16 U.S.C. § 796(18)(A) .................................................................................................. 11

16 U.S.C. § 796-818 ......................................................................................................... 9

16 U.S.C. § 820-23 ........................................................................................................... 9

16 U.S.C. § 823a-23g ....................................................................................................... 9

16 U.S.C. § 824 ................................................................................................................. 9

16 U.S.C. § 824a-3 .............................................................................................. 10, 11, 13

16 U.S.C. § 824a-3(b)-(c) ............................................................................................... 11

16 U.S.C. § 824a-3(d) ..................................................................................................... 11

16 U.S.C. § 824a-3(e)(1) ................................................................................................. 11

16 U.S.C. § 824a-3(f) ................................................................................................ 13, 14

16 U.S.C. § 824a-3(l) ................................................................................................. 11, 12

16 U.S.C. § 824a-824j ....................................................................................................... 9

16 U.S.C. § 824j-1 ............................................................................................................. 9

16 U.S.C. § 824k .............................................................................................................. 9

16 U.S.C. § 824p-24w ...................................................................................................... 9

16 U.S.C. § 824q-1 ........................................................................................................... 9

16 U.S.C. § 825 ................................................................................................................. 9

16 U.S.C. § 825a .............................................................................................................. 9

16 U.S.C. § 825p .............................................................................................................. 9

16 U.S.C. § 825r ............................................................................................................... 9

Public Utility Regulatory Policies Act of 1978 Section 210(h)(2)(A) ............................................4

Public Utility Regulatory Policies Act of 1978 Section 210(h)(2)(B)............................................19

**Regulations and Rules**

18 C.F.R. Part 292...........................................................................................................................2

18 C.F.R. § 292.203(a)(1) .............................................................................................................12

18 C.F.R. § 292.203(a)(2) .............................................................................................................12

18 C.F.R. § 292.203(a)(3) .............................................................................................................12

18 C.F.R. § 292.203(b)(1) .............................................................................................................11

18 C.F.R. § 292.203(b)(2) .............................................................................................................11

18 C.F.R. § 292.204(a)(1) .............................................................................................................12

18 C.F.R. § 292.204(b)(1)(i) .........................................................................................................12

18 C.F.R. § 292.205(a) ..................................................................................................................11

18 C.F.R. § 292.205(b) ..................................................................................................................11

18 C.F.R. § 292.205(d) ..................................................................................................................11

18 C.F.R. § 292.207.......................................................................................................................12

18 C.F.R. § 292.304(d) .............................................................................................................12, 13

18 C.F.R. § 292.304(d)(2)....................................................................................................13, 15, 16

Small Power and Cogeneration Facilities; Regulations Implementing Section 210
    of PURPA (FERC Order No. 69), 45 Fed. Reg. 12,214 (Feb. 25,1980) .....2, 13, 14, 16, 17, 19

Fed. R. Civ. P. 56(a) .......................................................................................................................6

Fed. R. Civ. P. 56(b) .......................................................................................................................7

D.N.M.LR-Civ. 56.1(b) ..................................................................................................................1

New Mexico Administrative Code Rule 570

    N. M. Code R. § 17.9.570.9(A) ..........................................................................................14, 15

**Legislative History**

H.R. Rep. No. 95-496 (1977)...........................................................................9

H.R. Rep. No. 95-543 (1977)...........................................................................9

S. Rep. No. 95-442 (1977) ..............................................................................9

**Other Authorities**

Ben Raker, *Decentralization and Deference: How Different Conceptions of
    Federalism Matter for Deference and Why That Matters for Renewable
    Energy*, 47 Envtl. L. Rep. News & Analysis 10963 (2017) ....................10

Cogeneration, Wikipedia, https://en.wikipedia.org/wiki/Cogeneration (last visited
    May 3, 2019)...........................................................................................11

Deirdre O'Callaghan & Steve Greenwald, *PURPA from Coast to Coast:
    America's Great Electricity Experiment*, 10 Nat. Resources & Env't 17
    (Winter 1996)....................................................................................13, 14

Jim Rossi & Thomas Hutton, *Federal Preemption and Clean Energy Floors*, 91
    N.C. L. Rev. 1283 (2013) ........................................................................8

Michael D. Hornstein & J.S. Gebhart Stoermer, *The Energy Policy Act of 2005:
    PURPA Reform, the Amendments and their Implications*, 27 Energy L.J. 25
    (2006)...................................................................................................7, 11

Richard D. Cudahy, *PURPA: The Intersection of Competition and Regulatory
    Policy*, 16 Energy L.J. 419 (1995) .....................................................8, 10

Rohit C. Sharma, *Niagara Mohawk Power Corp. v. FERC*, 23 Energy L.J. 157
    (2002)........................................................................................................8

Stanley A. Martin, *Problems with PURPA: The Need for State Legislation to
    Encourage Cogeneration and Small Power Production*, 11 B.C. Envtl. Aff. L.
    Rev. 149 (1983) ........................................................................................9

Steven Ferrey et. al., *Fire and Ice: World Renewable Energy and Carbon Control
    Mechanisms Confront Constitutional Barriers*, 20 Duke Envtl. L. & Pol'y F.
    125 (2010)................................................................................................10

## INTRODUCTION

COMES NOW, Plaintiffs Great Divide Wind Farm 2 LLC and Great Divide Wind Farm 3 LLC (collectively, "Great Divide"), by and through counsel, with its Motion for Summary Judgment on its Amended Complaint, and Memorandum in Support thereof.  Great Divide respectfully submits that no material facts are in dispute and it is entitled to judgment as a matter of law on its claim that the New Mexico Public Regulation Commission (the "NMPRC") has unlawfully implemented the Public Utility Regulatory Policies Act of 1978 ("PURPA") and the Federal Energy Regulatory Commission's ("FERC") regulations.  Counsel for Defendants have advised that they oppose the Motion; proposed intervenor El Paso Electric ("EPE") has not yet had an opportunity to respond.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

As required by D.N.M.LR-Civ. 56.1(b), Great Divide sets out the following statement of material facts as to which no genuine issue exists.  The following facts are taken from the parties' numbered stipulations in their Joint Status Report, dated April 1, 2019 ("JSR") (Doc. 35).

1. Great Divide's New Mexico wind energy projects are each a qualifying facility ("QF") under the Federal Power Act, as amended by the Public Utility Regulatory Policies Act of 1978 ("PURPA").  JSR [Doc. 35] ¶ 1, at 2.

2. Defendants Commissioners Theresa Becenti-Aguilar, Cynthia Hall, Jefferson Byrd, Valerie Espinoza and Stephen Fischmann, each serve in their official capacity as the current Commissioners of the NMPRC.  JSR ¶ 3, at 2.

3. The Federal Energy Regulatory Commission ("FERC") has promulgated

regulations to implement PURPA at 18 C.F.R. Part 292, in its Order No. 69,

Small Power Production and Cogeneration Facilities; Regulations Implementing

Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg.

12,214 (Feb. 25, 1980).  JSR ¶ 6, at 3.

4.   The NMPRC implements FERC's PURPA regulations in state regulations

published at 17.9.570 of the New Mexico Administrative Code ("Rule 570"), and

through its interpretation of Rule 570.  JSR ¶¶ 7-8, at 3.  *See also* Memorandum

Opinion and Order, at 50 (Doc. 55)("Op.")(explaining how NMPRC implements

PURPA through its interpretation of Rule 570).

5.   The NMPRC, in a decision rendered on August 3, 2016 in its Case No. 11-00466-

UT, dismissed a complaint by Western Water and Power Production, Limited,

LLC (WWPP) concerning the existence of a legally enforceable obligation for the

Public Service Company of New Mexico to the purchase of energy produced by

WWPP.  The NMPRC ruled that Rule 570 establishes that a utility has an

obligation to purchase energy from a QF from the time of interconnection, and

that a utility does not have an obligation purchase power from a QF before the

date of interconnection.  JSR ¶ 8, at 3; Final Order Dismissing Complaint

("WWPP Order") ¶¶ 12, 14, at 4-5 (*Western Water & Power Prod. Ltd., LLC v.*

*Pub. Serv. Co. of N.M.,* No. 11-00466-UT (N.M. Pub. Regulation Comm'n Aug.

3, 2016).

6.   The NMPRC Final Order in Case No. 11-00466-UT ruled that Rule 570.9

requires a QF to demonstrate that it is ready to interconnect and deliver energy

before a legally enforceable obligation is recognized.  WWPP Order ¶¶ 17-19, at 7-9.

7.  The NMPRC interpreted its own Rule 570.9 to mean that a utility has no obligation to accept a QF's offer, and that no legally enforceable obligation is created, until the facility is ready to be interconnected.  JSR ¶ 8, at 3.

8.  The NMPRC found that Rule 570.9 imposes the purchase obligation only if the QF is ready to interconnect to the utility's system. The NMPRC dismissed WWPP's complaint because its facility was un-built and therefore was not "ready to be interconnected."  JSR ¶ 8, at 3.

9.  On August 27, 2018, Great Divide filed a formal complaint against EPE with the NMPRC, initiating NMPRC Case No. 18-00268-UT, in which Great Divide sought that the NMPRC declare the terms of a legally enforceable obligation by which El Paso Electric Company shall purchase the output of Great Divide's wind facilities at a long-term avoided cost rate.  JSR ¶ 10, at 4.

10. On November 7, 2018, the NMPRC dismissed Great Divide's complaint without prejudice on grounds it was "virtually the same as WWPP, and similarly finds this case should be dismissed, according to the plain language of Rule 570.9."  JSR ¶ 11, at 4; Final Order Dismissing Complaint, ("Great Divide Order") at p. 9, *In the Matter of the Formal Complaint of Great Divide Wind Farm 2 and Great Divide Wind Farm 3 Against El Paso Electric Company*, No. 18-00268-UT (N.M. Pub. Reg. Comm'n Nov. 7, 2018), (Doc. 56-1).

11. Further, the NMPRC found "that the plain language of Rule 570.9 establishes that

at the point in time when a QF is ready to be interconnected, that is when a legally enforceable obligation arises." JSR ¶ 11, at 4.

12. As further grounds for dismissing Great Divide's case, the NMPRC stated that "FERC declined to declare in any way that the NMPRC's decision in WWPP case was wrong.… The NMPRC's ruling was not declared by FERC to be contrary to PURPA and FERC regulations." Great Divide Order, ¶ 12, at 4.

13. On December 6, 2018, Great Divide petitioned FERC to bring an enforcement action against the NMPRC for its failure to implement PURPA consistent with PURPA and FERC's regulations in FERC Docket EL19-25-000. JSR ¶ 13, at 4.

14. On February 4, 2019, FERC issued a Notice of Intent Not to Act and Declaratory Order. *Great Divide Wind Farm 2 LLC and Great Divide Wind Farm 3 LLC*, 166 FERC ¶ 61,090 (2019) ("2019 FERC Notice of Intent Not to Act") wherein FERC declined to initiate an enforcement action under Section 210(h)(2)(A) of PURPA against the NMPRC. JSR ¶ 14, at 4-5.

15. In the 2019 FERC Notice of Intent Not to Act, FERC also stated that:

Notices of Intent Not to Act in the absence of an associated declaratory order cannot be read to mean that the Commission has accepted or agreed with (or alternatively, rejected or disagreed with) any argument made by any party, or with any substantive determination by a state regulatory authority or unregulated electric utility described in the petition for enforcement. The Commission's silence is not evidence of a Commission determination on the merits of the parties' arguments . . .the New Mexico Commission should not rely on the January 2017 Notice of Intent Not to Act [in the WWPP docket] as a ruling that the New Mexico Commission has correctly interpreted or applied the Commission's regulations, or that the New Mexico Commission's actions complained of here are consistent with (or, alternatively, are inconsistent with) this Commission's regulations. JSR ¶ 15, at 5.

## PROCEDURAL BACKGROUND

The Court's Opinion sets forth the procedural background in this case from the filing of Great Divide's original Complaint for Declaratory and Injunctive Relief, filed February 6, 2019 (Doc. 1) ("Complaint") to the hearing on Defendants and proposed intervenor EPE's Joint Motion to Dismiss for lack of subject matter jurisdiction.  (Doc. 55) ("Op.").  As such, there is no need to repeat that here.

On May 16, 2019, the Court issued its Opinion.  Therein, granting in part and denying in part the Joint Motion to Dismiss, the Court ordered that Great Divide may amend its Complaint to bring an implementation challenge to Rule 570 or the NMPRC's interpretation of Rule 570 so that the Court has jurisdiction.  Op. at 51.  The Court, for which Great Divide is extremely grateful, "quickly issue[d] this opinion in fairness to [Plaintiffs], which seek to resolve the issues in this case within a timeframe that will permit them to complete construction on their wind energy projects before 2020's end."  Op. at 2, fn. 1.

On May 30, 2019, Great Divide filed its Amended Complaint against Defendants (NMPRC Commissioners) in conformance with the Court's Opinion, challenging Rule 570 and NMPRC's interpretation of Rule 570 for violating of PURPA and FERC's regulations.  The Amended Complaint seeks no relief against proposed intervenor EPE.

Two other motions are pending in this case, Defendants' motion to disqualify Mr. Marks and proposed intervenor EPE's motion to intervene.  Op. at 2, fn. 1.  The Court advised that it will issue later opinions and orders addressing those two motions.  *Id.*  Great Divide hopes to resolve those ancillary motions in a manner acceptable to the parties to avoid the need for the

Court to write such opinions, while at the same time ensuring that the legal issue as to whether NMPRC's PURPA implementation is valid under federal law can be quickly presented for the Court's consideration.  All parties and counsel are acting in the utmost good faith in this regard and with professional courtesy, but no final resolution has been reached yet.

The JSR between Defendants and Great Divide stipulated and agreed that in the event Defendants did not prevail on their Motion to Dismiss for lack of subject matter jurisdiction, *i.e.*, the Court determined it had jurisdiction to proceed, that venue is properly laid in this District, and this Court, the United States District Court for the District of New Mexico, has jurisdiction over the parties.  JSR, at p. 2.  They further stipulated to the undisputed material facts set forth above (JSR, at pp. 2-5), and to the law governing this case:  PURPA, FERC's regulations, federal caselaw, Rule 570, and the New Mexico Public Utility Act (JSR, at p.5).  If this Court determined it did have jurisdiction over this matter, *i.e.,* the Motion to Dismiss was not granted in full, the parties further agreed that "discovery is unneeded on question of whether Rule 570.9 is a lawful implementation of FERC's PURPA rules, which is a pure legal question."  JSR, at p. 9.  Great Divide noted in the JSR its intention to file a motion for summary judgment and Defendants noted their intention to file a response to such motion.  *Id.*

**LAW REGARDING SUMMARY JUDGMENT**

Rule 56(a) of the Federal Rules of Civil Procedures states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(b), as amended in 2009 and 2010, provides that "unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment <u>at any time</u> until 30 days after

6

the close of all discovery."  Fed. R. Civ. P. 56(b) (emphasis added).  Rule 56(b) allows for

prompt resolution of legal issues where no materials facts are in dispute.  The Committee Notes

to the 2009 Amendment explain that the prior timing provisions for summary judgment were

"outmoded" and "the new rule allows a party to move for summary judgment at any time, even

as early as the commencement of the action."   The 2010 Amendment, in turn, permits local rules

and orders to regulate timing to fit the needs of the case.  Here, the parties have stipulated to the

requisite material facts and further agreed that discovery is not needed to resolve the pure legal

question as to whether NMPRC's PURPA implementation plan is valid under federal law.  JSR,

at p. 9.  Further, this Court has also recognized the fairness of Great Divide's goal to promptly

resolve the issues in this case and, as such, worked extremely hard to quickly issue its detailed

and lengthy opinion.  Op. at 2, fn. 1.  Thus, it is appropriate at this time for Great Divide to move

for summary judgment on the pure legal question presented by the Amended Complaint.

### LAW REGARDING PURPA AND THE RELATED FERC REGULATIONS

The following description of the law regarding PURPA and related FERC regulations is

taken directly from the Court's Opinion.

Congress enacted PURPA in the late 1970s to encourage the development of alternative

energy sources.  *See F.E.R.C. v. Mississippi*, 456 U.S. 743, 756-57 (1982).  Concerns about the

United States of America's lagging domestic oil market and recent energy scarcities fueled

Congress' interest in alternative resources.  *Id.*; *See also* Michael D. Hornstein & J.S. Gebhart

Stoermer, *The Energy Policy Act of 2005: PURPA Reform, the Amendments and their

Implications*, 27 Energy L.J. 25, 25-26 (2006)(describing PURPA as "the Carter administration's

response to the energy crises of the 1970s, most notably the Middle East oil embargo of 1973-74

and a second oil 'shock' in 1977.").  The United States relied on foreign oil, faced shortages in

natural gas, and had experienced increases in electricity costs.  *See F.E.R.C. v. Mississippi*, 456

U.S. at 756.  *See also* Richard D. Cudahy, *PURPA: The Intersection of Competition and*

*Regulatory Policy*, 16 Energy L.J. 419, 421 (1995)(describing that PURPA responded to

"dramatic and severe shortages of oil and natural gas and skyrocketing prices of almost every

form of energy [that had] prompted public concern"; "the Arab oil embargo [that] interdict[ed]

supplies from the Middle East"; "an intense desire to reduce dependence on foreign oil (and on

fossil fuels generally) and to diversify technologies used for the generation of electricity"; and

the desire to encourage alternative electricity generation through renewable resource "because of

the painful scarcity of oil and natural gas and environmental and safety objections to coal and

nuclear power."); Jim Rossi & Thomas Hutton, *Federal Preemption and Clean Energy Floors*,

91 N.C. L. Rev. 1283, 1306 (2013)("In the five years prior to PURPA's enactment, natural gas

and oil—which together accounted for about one third of the electricity generation portfolio—

had increased in cost by 175% and 400%,respectively."); Rohit C. Sharma, *Niagara Mohawk*

*Power Corp. v. FERC*, 23 Energy L.J. 157, 157 (2002) ("PURPA was intended by Congress to

combat a nationwide energy crisis by promoting long-term economic growth by reducing the

nation's reliance on oil and gas and to encourage development of alternative energy sources.").

Congress confronted an electricity industry that used a higher percentage of energy in the

country than it produced.  *See F.E.R.C. v. Mississippi*, 456 U.S. at 756.

  The Supreme Court of the United States describes in detail the background against which

Congress legislated:

> Committees in both Houses of Congress noted the magnitude of the Nation's
> energy problems and the need to alleviate those problems by promoting energy

conservation and more efficient use of energy resources. See S. Rep. No. 95-442, at 7-10; H.R. Rep. No. 95-543, vol. I, pp. 5-10 (1977); H.R. Rep. No. 95-496, pt. 4, pp. 3-7, 125-130 (1977). Congress was aware that domestic oil production had lagged behind demand and that the Nation had become increasingly dependent on foreign oil. *Id.*, at 3. The House Committee observed: "Reliance upon imported oil to meet the bulk of U. S. oil demands could seriously jeopardize the stability of the Nation's economy and could undermine the independence of the United States." *Ibid.* See H.R. Rep. No. 95-543, vol. I, at 5-6. Indeed, the Nation had recently experienced severe shortages in its supplies of natural gas. *Id.*, at 7. The House and Senate Committees both noted that the electricity industry consumed more than 25% of the total energy resources used in this country while supplying only 12% of the user demand for energy. S. Rep. No. 95-442, at 7-8; H.R. Rep. No. 95-496, pt. 4, at 125. In recent years, the electricity utility industry had been beset by numerous problems, *id.*, at 129, which resulted in higher bills for the consuming public, a result exacerbated by the rate structures employed by most utilities. S. Rep. No. 95-442, at 26. Congress naturally concluded that the energy problem was nationwide in scope, and that these developments demonstrated the need to establish federal standards regarding retail sales of electricity, as well as federal attempts to encourage conservation and more efficient use of scarce energy resources. See id., at 24-32; H.R. Rep. No.95-496, pt. 4, at 131-133, 136-138, 170-171.

Congress also determined that the development of cogeneration and small power production facilities would conserve energy. The evidence before Congress showed the potential contribution of these sources of energy: it was estimated that if proper incentives were provided, industrial cogeneration alone could account for 7%-10% of the Nation's electrical generating capacity by 1987. S. Rep. No. 95-442, at 21, 23.

*F.E.R.C. v. Mississippi*, 456 U.S. at 756-57.

PURPA amends portions of the Federal Power Act, 16 U.S.C. §§ 791a, 792, 793, 796-818, 820-23, 823a-23g, 824, 824a-824j, 824j-1, 824k, 824p-24w, 825, 825a, 825p, 824q-1, 825r, and, more importantly for this litigation, adds provisions to encourage the development of nontraditional energy facilities. *See* Stanley A. Martin, P*roblems with PURPA: The Need for State Legislation to Encourage Cogeneration and Small Power Production*, 11 B.C. Envtl. Aff. L. Rev. 149, 157 (1983). Through the additional provisions, Congress attempted to address two specific factors that it believed inhibited the nontraditional energy industry. *See F.E.R.C. v.*

*Mississippi*, 456 U.S. at 750-51.  The problems were the reluctance of "traditional electricity utilities" "to purchase power from, and to sell power to, the nontraditional facilities," and the "financial burdens" that state and federal utilities authorities imposed on the nontraditional facilities through energy regulations.  *Id.*  See Cudahy, *supra*, at 422 ("A major problem confronting both cogeneration and energy from renewable sources was that the electric utilities comprised almost the only market for electricity from these alternative energy sources.  And the utilities, for various reasons—including cost—were reluctant to purchase power from their potential competitors."); Steven Ferrey et. al., *Fire and Ice: World Renewable Energy and Carbon Control Mechanisms Confront Constitutional Barriers*, 20 Duke Envtl. L. & Pol'y F. 125, 140 (2010) (listing concerns that Congress addressed through PURPA); Ben Raker, *Decentralization and Deference: How Different Conceptions of Federalism Matter for Deference and Why That Matters for Renewable Energy*, 47 Envtl. L. Rep. News & Analysis 10963, 10965 (2017) (explaining that energy utilities at the time of PURPA's passage sold and produced power and preferred more consistent power sources than renewable energy facilities, which relied on "fickle" energy resources, so hesitated to purchase power from other, nontraditional energy companies).  To address the first concern, Congress required FERC to establish rules that require electric utilities to sell electric energy to and purchase electric energy from nontraditional energy facilities—the qualifying facilities.  *See* 16 U.S.C. § 824a-3.  Congress directs FERC that the rates which electric utilities pay to purchase electric energy and at which electric utilities sell electric energy "shall be just and reasonable to the electric consumers of the electric utility and in the public interest," and "shall not discriminate against qualifying cogenerators or qualifying small power producers."  16 U.S.C. § 824a-3(b)-(c).  The rates for purchasing electric energy

must not exceed "the cost to the electric utility of the electric energy which . . . such utility would generate or purchase from another source" had the electric utility not purchased from the qualifying facility. 16 U.S.C. § 824a-3(d).  *See* Hornstein & Stoermer, *supra*, at 30 ("PURPA created a market for the power generated by QFs [(qualifying facilities)] by requiring electric utilities to purchase energy generated by QFs and by instructing the FERC to promulgate rules to ensure that the rates for such purchases are just and reasonable and do not discriminate against QFs.").  To resolve the second concern, Congress asked FERC to create regulations exempting the non-traditional energy sources from specified federal and state regulations.  *See* 16 U.S.C. § 824a-3(e)(1).

PURPA protects two forms of qualifying facility.  *See* 16 U.S.C. § 824a-3.  The first form—a "cogeneration facility"—produces "(i) electric energy, and (ii) steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796(18)(A).  *See* 16 U.S.C. § 824a-3(l).  Cogeneration, for instance, preserves heat—thermal energy—from a system that creates energy and uses that heat for another purpose. *See* Cogeneration, Wikipedia, https://en.wikipedia.org/wiki/Cogeneration (last visited May 3, 2019). In a combined heat and power plant, that other purpose might, for example, be for heating.  *Id.*  A cogeneration facility becomes qualified for PURPA's purposes on the filing of "a notice of self-certification" with FERC unless exempted from the requirement, 18 C.F.R. § 292.203(b)(2); *see* 16 U.S.C. § 824a-3(l), and on meeting FERC's output, efficiency, and use standards, *see* 16 U.S.C. § 824a-3(l); 18 C.F.R. § 292.203(b)(1); 18 C.F.R. § 292.205(a), (b), (d).

The second form of qualifying facility—a "[s]mall power production facility"— "produces electric energy solely by the use, as a primary energy source, of biomass, waste,

11

renewable resources, geothermal resources, or any combination thereof." 16 U.S.C.

§ 796(17)(A).  *See* 16 U.S.C. § 824a-3(l).  This category accounts for, for instance, wind farms,

dams, and solar energy facilities.  *See* 16 U.S.C. § 796(17)(A).  Congress limits PURPA's

benefits to those facilities producing no more than eighty megawatts of energy at their sites.  *See*

16 U.S.C. § 796(17)(A); 16 U.S.C. § 824a-3(l).  A small power production facility meets

FERC's requirements for qualification on producing less than eighty megawatts, *see* 16 U.S.C.

§ 824a-3(l); 18 C.F.R. § 292.203(a)(1); 18 C.F.R. § 292.204(a)(1); deriving seventy-five percent

or more of its energy input from "biomass, waste, renewable resources, geothermal resources, or

any combination thereof," 18 C.F.R. § 292.204(b)(1)(i); *see* 16 U.S.C. § 824a-3(l); 18 C.F.R.

§ 292.203(a)(2); and filing a "notice of self-certification" unless exempted from such filing, *see*

16 U.S.C. § 824a-3(l); 18 C.F.R. § 292.203(a)(3); 18 C.F.R. § 292.207.

  In implementing PURPA, FERC enacted prescriptions that address the unique challenges

facing nontraditional energy sources.  *See* 18 C.F.R. § 292.304(d).  FERC provides that electric

utilities may purchase electric energy from qualifying facilities either as the energy becomes

available for purchase or "pursuant to a legally enforceable obligation."[1] 18 C.F.R.

---

[1] FERC provides:

  Each qualifying facility shall have the option either:

  (1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or

  (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

§ 292.304(d)(2).  FERC understands that investors in new technology need certainty in their returns. *See* FERC Order No. 69, Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,224 (Feb. 25, 1980) ("FERC Order No. 69").  Energy utilities that purchase pursuant to a legally enforceable obligation may pay at the qualified facilities' choice either "[t]he avoided costs," i.e., the cost to the electric utility of the energy that the utility would generate or purchase from another source, calculated on delivery, or "[t]the avoided costs calculated at the time the obligation is incurred."  18 C.F.R. § 292.304(d)(2).  In allowing the [QFs the] option to have the energy utility pay the long-term avoided cost, FERC contemplates "contractual commitments based, by necessity, on estimates of future avoided costs." FERC Order No. 69 at Fed. Reg. 12,224.

The statutory scheme in 16 U.S.C. § 824a-3 at the same time grants the states considerable authority in PURPA's field and constricts considerably states' authority in that field.  See 16 U.S.C. § 824a-3(f); *F.E.R.C. v. Mississippi*, 456 U.S. at 759 (describing 16 U.S.C. § 824a-3(f) as "troublesome" because it requires states to implement FERC's regulations).  Congress leaves implementation of the FERC regulations at the state level to the states but requires that the states implement the regulations that FERC passes.  *See* Complaint ¶ 26, at 7; 16 U.S.C. § 824a-3(f). Deirdre O'Callaghan and Steve Greenwald recount that, in enacting PURPA,

> The federal government identified and prioritized problems related to a matter of significant national interest (domestic energy supplies versus dependence on

---

(i)      The avoided costs calculated at the time of delivery; or

(iii)      The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d).

13

> foreign oil) controlled at least in part by matters principally left to the states (retail rate regulation of public utility companies), and required the states to address matters central to these problems, but permitted them to do so in widely varying ways with widely varying results.

Deirdre O'Callaghan & Steve Greenwald, *PURPA from Coast to Coast: America's Great Electricity Experiment*, 10 Nat. Resources & Env't 17, 17 (Winter 1996) (characterizing PURPA as "one of the grand policy experiments of our generation").  States have "'great latitude in determining the manner of implementation of the Commission's rules, provided that the manner chosen is reasonably designed to implement the requirements' of FERC regulations."  *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 385 (5th Cir. 2014) (citing Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12214, 12230-31 (Feb. 25, 1980)).  A state may, for instance, implement PURPA and the FERC regulations through rulemaking or by adjudicating disputes that arise under the rules.  *See Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d at 385 (citing *F.E.R.C. v. Mississippi*, 456 U.S. at 759-60).

## RULE 570

As noted above, Congress delegates to the states the authority to implement FERC's regulations.  16 U.S.C. § 824a-3(f).  Pursuant to this authority, the NMPRC promulgated Rule 570 of the New Mexico Administrative Code.  Rule 570 provides, in pertinent part:

> Each utility shall purchase power from a qualifying facility from the date of interconnection at the utility's avoided cost.  An electric utility is obligated to purchase power from a qualifying facility at the utility's avoided cost regardless of whether the electric utility making such purchase is simultaneous selling power to the qualifying facility.

N. M. Code R. § 17.9.570.9(A).

14

## LEGAL ISSUE TO BE DECIDED

The legal issue to be decided in this case is whether NMPRC's PURPA implementation plan, specifically Rule 570 and NMPRC's interpretation of that Rule, violates PURPA and FERC's PURPA regulations.

## ARGUMENT

The key FERC PURPA regulation at issue in this litigation is Section 292.304(d)(2). That Section provides that each QF "shall have the option… [t]o provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either: (i) [t]he avoided costs calculated at the time of delivery; or (ii) [t]he avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2).

Rule 570, which implements FERC's PURPA regulations, including Section 292.304(d)(2), provides that "[e]ach utility shall purchase power from a qualifying facility from *the date of interconnection* at the utility's avoided cost." N.M. Code R. § 17.9.570.9(A) (emphasis added). The NMPRC further interprets Rule 570 to mean that a utility has no obligation to accept a QF's offer, and that no legally enforceable obligation is created, until the facility is interconnected or ready to be interconnected. *See* Undisputed Material Facts, 4-12; JSR ¶¶, 8, 11, at 3, 4; WWPP Order ¶ 19, at 9; Great Divide Order ¶ 19, at 7. Thus, NMPRC's implementation plan interprets PURPA and FERC's regulations to require a utility to enter into a legally enforceable obligation to purchase power from a QF only when that energy is available and the QF is interconnected or ready to be interconnected, *i.e.*, at the beginning of that

obligation's specified term.  *Id.*

NMPRC's implementation plan directly contradicts the plain language of Section 292.304(d)(2) because it deprives QFs of the option to exercise their federal mandated right, "prior to the beginning of the specified term," to a legally enforceable obligation for the delivery of energy or capacity "over a specified term," at long-term avoided cost rates calculated at "the time the obligation is incurred."  18 C.F.R. § 292.304(d)(2).

NMPRC's implementation plan also contradicts FERC's Order adopting its PURPA regulations, Order No. 69, where FERC stated that certainty regarding the future sale of it a QF's power output is needed "before [the] construction of a facility" so that investors can estimate the expected return on a potential investment.  Order No. 69 at 45 Fed. Reg. 12,218.  Op. 30. Further, in allowing QFs the option to have the energy utility pay long-term avoided cost rates, FERC also contemplated "contractual commitments based, by necessity, on estimates of future avoided costs."  45 Fed. Reg. at 12,224.  Accordingly, FERC specifically crafted Section 292.304(d)(2) to give QFs the right to a legally enforceable obligation prior to its specified term at long term avoided cost rates calculated at the time the obligation is incurred.  FERC Commissioner Stalon articulated the importance of the need for certainty as follows:

> In the comment process prior to promulgation of our rules… [m]any such [QF] projects, we were told, would be project financed, i.e., rely on the assets and particularly the revenue stream of the project itself as the third-party lender's security.  A recent study indicates that this prediction was accurate.  Given the lender's heavy reliance on a revenue stream in this form of financing, certainty of that revenue stream, fixed in advanced, is critical to the ability to finance, we were informed.  We concluded, therefore, that the need for certainty with regard to return on investment for QF power was essential to the initial economic development of QF generation and to meet the goal of Congress to encourage that QF development.

*Applied Energy Servs., Inc. v. Okla. Corp. Comm'n.*, 31 FERC ¶ 61,313, at 61,709 (1985)

(Stalon, Commissioner) (citing 45 Fed. Reg. at 12,224) (internal footnote omitted).  State

courts have also recognized this need for certainty.  In a decision upholding a state

commission's imposition of an order imposing long-term purchase rates on a utility, the

Supreme Court of New Hampshire held that "[i]n implementing PURPA's policy of

encouraging the development of new technologies, the FERC has recognized that

investors must be able to estimate the expected return on their investment with reasonable

certainty before the development of a qualifying facility." *Pub. Serv. Co. of N.H.*, 539

A.2d 275, 280 (N.H. 1988).  A state implementation plan, such as the NMPRC's, which

delays the creation of the legally enforceable obligation until after a facility is constructed

and interconnected (or ready to be interconnected) to a utility and can deliver energy,

guts the certainty provided by Section 292.304(d)(2) and impedes the development of

QFs in violation of the very purpose of PURPA.

Consistent with the plain language of Section 292.304(d)(2), and its Order No. 69,

FERC has consistently ruled that it is a QF's commitment to sell power in the future, not

its ability to make power immediately available from a completed generating facility, that

entitles the QF to a legally enforceable obligation from a utility.  *FLS Energy, Inc.*, *et al.*,

157 FERC ¶ 61,211, at P 24 (2016) ("*FLS Energy*") (citing *JD Wind 1, LLC*, *et al.*, 129

FERC ¶ 61,148, at P 25 (2009), *reh'g denied*, 130 FERC ¶ 61,127 (2010)).  In *Grouse

Creek*, FERC held "[i]n order to protect the rights of a QF, once a QF makes itself

available to sell to a utility, a legally enforceable obligation may exist prior to the

formation of a contract," and a "[legally enforceable] obligation can pre-date the signing

17

of the contract." *Grouse Creek Wind Park, LLC*, 142 FERC ¶ 61,187, at P 40 (2013)

("*Grouse Creek*").  Further, the QF that commits itself "'to sell to an electric utility, also

commits the electric utility to buy from the QF; these commitments result either in

contracts or in non-contractual, but binding, legally enforceable obligations.'"  *Id*. (citing

*JD Wind 1, LLC*, 129 FERC ¶ 61,148, at P 25 (2009)).  Indeed, FERC has ruled that a

state regulatory commission may not impede the development of renewable energy

projects under PURPA by requiring more than a QF's commitment as a prerequisite to

the determination of the terms of the legally enforceable obligation.  *FLS Energy*, 157

FERC ¶ 61,211 at PP 20, 23-26 (holding that "a requirement [by the Montana Public

Service Commission] for a facilities study or an interconnection agreement. . . as a

predicate for a legally enforceable obligation is inconsistent with PURPA and [FERC's]

regulations under PURPA.").

  At bottom, NMPRC's implementation plan strikes Section 292.304(d)(2) from

FERC's PURPA regulations and replaces it with an entirely new section which provides

as follows: "Each qualifying facility shall NOT have the option to enter into a long-term

legally enforceable obligation with a purchasing utility, at long-term avoided cost rates,

prior to the specified term of that obligation; rather each qualifying facility shall ONLY

be entitled to a legally enforceable obligation at the beginning of that obligation's term

when the qualifying facility is interconnected to the utility."  To be sure, states have

"'great latitude in determining the manner of implementation of the Commission's rules,"

but, as this Court has correctly recognized, they are constrained to do so in a manner that,

at minimum, is "reasonably designed to implement the requirements of FERC

18

regulations."  Op. 31, quoting *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d at 385 (citing

Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of

1978, 45 Fed. Reg. 12,214, 12,230-31 (Feb. 25, 1980)).  And when a state PURPA

implementation plan directly conflicts with the requirements of FERC's regulations, as

NMPRC's does, the state commission's interpretation is not entitled to deference.  *See,*

*e.g.*, *Allco Renewable Energy Ltd. v. Mass. Elec. Co.*, 208 F. Supp. 3d 390, 399 (D. Mass.

2016), *aff'd*, 875 F.3d 64 (1st Cir. 2017) ("*Allco*") (same); *Winding Creek Solar LLC v.*

*Peevy*, 293 F. Supp. 3d 980, 991 (N.D. Cal. 2017) (stating "whatever latitude the state

agency is to be given 'to implement FERC's PURPA rules does not justify an

implementation that plainly conflicts with those rules'" (quoting *Allco*, 208 F. Supp. 3d at

399).  Simply put, NMPRC does not have the authority to rewrite FERC's PURPA

regulations.

## CONCLUSION

NMPRC's PURPA implementation plan denies the availability of a legally enforceable

obligation at long-term avoided cost rates to QFs until a QF is constructed, interconnected, and

ready to deliver power to an electric utility at the beginning of the obligation's term.  This denial

runs directly counter, and is not reasonably designed to implement, PURPA and FERC's

regulations, including Section 292.304(d)(2).  Indeed, NMPRC's implementation plan, in

contradiction of the letter and spirit of PURPA and FERC's regulations, impedes the

development of QFs.  Accordingly, Great Divide respectfully requests that the Court, pursuant to

its authority under Section 210(h)(2)(B) of PURPA, (i) declare that NMPRC's implementation

plan regarding the creation of legally enforceable purchase obligations for QFs is invalid under

PURPA and FERC's PURPA regulations, and (ii) enjoin Defendants, in their official capacities

as Commissioners of the NMPRC, to adopt an implementation plan consistent with federal law.

Date:  June 12, 2019                           Respectfully submitted,

                                                            ORRICK, HERRINGTON & SUTCLIFFE LLP

                                                            */s/ Cory Lankford*         
                                                            Jonathan Guy
                                                            Adam Wenner
                                                            Cory Lankford
                                                            Columbia Center
                                                            1152 15th St. N.W.
                                                            Washington, D.C. 20005
                                                            Telephone:     +1 202 339 8400
                                                            Facsimile:     +1 202 339 8500
                                                            jguy@orrick.com

                                                            *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12th, 2019, I provided service of the foregoing Motion for Summary Judgment on the following counsel by email.

Judith Amer
Associate General Counsel
NMPRC
1120 Paseo de Peralta
Santa Fe, NM 87502
(505) 827-6074
*Attorney for Defendants*

Carol Clifford
Jerry Todd Wertheim
Jones, Snead, Wertheim & Clifford, P.A.
PO Box 2228
Santa Fe NM 87504
(505) 982-0011
*Attorneys for El Paso Electric Company*

By:     */s/ Cory Lankford*
        Cory Lankford