# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GREAT DIVIDE WIND FARM 2 LLC, a
Delaware corporation, and GREAT DIVIDE
WIND FARM 3 LLC, a Delaware corporation,

        Plaintiffs,

vs.

                                  No. CIV 19-0099 JB\CG

THERESA BECENTI AGUILAR,
CYNTHIA HALL, JEFFERSON BYRD,
VALERIE ESPINOZA, and STEPHEN
FISCHMANN, in their official capacities
as the Commissioners of the New Mexico
Public Regulation Commission, and EL
PASO ELECTRIC COMPANY,

        Defendants,

and

SOUTHWESTERN PUBLIC SERVICE
COMPANY,

        Intervenor.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Summary Judgment

and Memorandum in Support of Motion for Summary Judgment, filed June 6, 2019

(Doc. 57)("MSJ"). The primary issue is whether the current commissioners of the New Mexico

Public Regulation Commission ("NMPRC"), Defendants Theresa Becenti Aguilar, Jefferson

Byrd, Valeria Espinoza, Stephen Fischmann, and Cynthia Hall (collectively, "the

Commissioners"), implemented the Public Regulatory Policies Act of 1978, 1 U.S.C. § 824a-3

("PURPA"), and its Federal Energy Regulatory Commission ("FERC") regulations in a manner that violates PURPA and its FERC regulations by requiring qualifying facilities ("QFs") to be ready to interconnect before they can establish a legally enforceable obligation with a utility. See MSJ at 20. The Court concludes that NMPRC's implementation plan, consisting of rule 570 of the New Mexico Administrative Code ("rule 570") and NMPRC's case-by-case adjudication interpreting rule 570, does not violate PURPA or the FERC's regulations promulgating PURPA, and denies the motion.

## FACTUAL BACKGROUND

The Court takes these facts from the parties' undisputed material facts in their summary judgment motion papers. See MSJ; Defendant's Response to Plaintiff's Motion for Summary Judgment, filed August 1, 2019 (Doc. 73)("Commissioners' Response"); Southwestern Public Service Company's Response to Great Divide Wind Farm 2's Motion for Summary Judgment, filed August 1, 2019 (Doc. 71)("SPS' Response")[1]; Defendant El Paso Electric Company's Response to Plaintiff's Motion for Summary Judgment, filed August 1, 2019 (Doc. 72)("El Paso Electric's Response"); and Plaintiff's Reply to Defendants' and Intervenors' Oppositions to Plaintiffs' Motion for Summary Judgment, filed August 15, 2019 (Doc. 77)("Great Divide's Reply"). No genuine issue exists as to these facts. The Court provides these facts for background.

Great Divide Wind Farm 2 LLC and Great Divide Wind Farm 3, LLC, (collectively, "Great Divide") have two QFs under the Federal Power Act, as amended by PURPA. MSJ ¶ 1,

---

[1]SPS's Response does not set forth any facts. See SPS' Response at 1.

at 1 (asserting this fact); Commissioners' Response ¶ 1, at 1-2 (asserting this fact). Great Divide states that these QFs ("Projects") will be operational in 2020.[2] See Commissioners' Response ¶ 2, at 2 (asserting this fact).[3] El Paso Electric Company is an investor-owned electric utility. See Commissioners' Response ¶ 4, at 2 (asserting this fact).[4]

The FERC promulgated rules implementing PURPA at 18 C.F.R. § 292. See MSJ ¶ 3, at 1-2 (asserting this fact); Commissioners' Response ¶ 5, at 32 (asserting this fact). The NMPRC implemented regulations in accordance with the FERC's rules regulating PURPA in New Mexico Administrative Code 17.9.570 ("rule 570"). See MSJ ¶ 4, at 2 (asserting this fact); Commissioners' Response ¶ 6, at 2 (asserting this fact). Western Water and Power Production, Limited, LLC ("WWPP") filed a complaint with the NMPRC about an alleged legally enforceable obligation created with the Public Service Company of New Mexico ("PNM").[5] MSJ ¶ 5, at 2 (citing Western Water Power Prod. Ltd., LLC v. Pub. Serv. Co. of N.M., No. 11-00466-UT (NMPRC Aug. 3, 2016)("WWPP"))(asserting this fact). In the final order, the

_____

[2]The Commissioners, El Paso Electric and SPS do not discuss the proffered fact, so the Court deems the fact undisputed. See D.N.M LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[3]Great Divide does not discuss the proffered fact, so the Court deems the fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[4]Great Divide does not discuss the proffered fact, so the Court deems the fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[5]The Commission, El Paso Electric, and SPS do not discuss the proffered fact, so the Court deems the fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

NMPRC concluded that rule 570.9 establishes a legally enforceable obligation on a utility "only if the QF is ready to interconnect to the utility's system" to deliver energy.[6]  MSJ ¶ 5, at 2 (asserting this fact).  The NMPRC, accordingly, dismissed the complaint.[7]  See MSJ ¶ 5, at 2 (asserting this fact).

On August 27, 2018, Great Divide filed a complaint asking the NMPRC to "declare the terms of a legally enforceable obligation" with El Paso Electric.  See Commissioners' Response ¶ 9 at 2 (asserting this fact).  The NMPRC dismissed the complaint without prejudice, citing its WWPP decision and rule 570's plain text.[8]  See MSJ ¶¶ 10-11, at 3-4 (asserting this fact).  In the dismissal, the NMPRC also cited the FERC's decision not to declare the NMPRC's ruling in WWPP "contrary to PURPA and FERC regulations."[9]  See MSJ ¶ 12, at 4 (asserting this fact).  On December 6, 2018, Great Divide petitioned the FERC "to bring an enforcement action against the NMPRC for its failure to implement PURPA consistent with PURPA and FERC's

---

[6]The Commission, El Paso Electric, and SPS do not discuss the proffered fact, so the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[7]The Commission, El Paso Electric, and SPS do not discuss the proffered fact, so the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[8]The Commission, El Paso Electric, and SPS do not discuss the proffered fact, so the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[9]The Commission, El Paso Electric, and SPS do not discuss the proffered fact, so the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

regulations," but the FERC instead issued a Notice of Intent Not to Act[10] and Declaratory Order in that case on February 4, 2019. See MSJ ¶¶ 13-14, at 4 (asserting this fact).[11]

## PROCEDURAL BACKGROUND

Great Divide filed its motion for summary judgment after the Court granted in part and denied in part the Commissioner's motion to dismiss. See MSJ at 5. Great Divide states that the issue in the present case is "whether NMPRC's PURPA implementation plan, specifically Rule 570 and NMPRC's interpretation of that Rule, violates PURPA and FERC's PURPA regulations." MSJ at 15. Great Divide asks the Court to "(i) declare that NMPRC's implementation plan regarding the creation of legally enforceable obligations for QFs is invalid under PURPA and FERC's PURPA regulations, and (ii) enjoin Defendants, in their official

---

[10]The parties include in their Joint Status Report the FERC's explanation of its Notice of Intent Not to Act:

Notices of Intent Not to Act in the absence of an associated declaratory order cannot be read to mean that the Commission has accepted or agreed with (or alternatively, rejected or disagreed with) any argument made by any party, or with any substantive determination by a state regulatory authority or unregulated electric utility described in the petition for enforcement. The Commission's silence is not evidence of a Commission determination on the merits of the parties' arguments . . . the New Mexico Commission should not rely on the January 2017 Notice of Intent Not to Act [in the WWPP docket] as a ruling that the New Mexico Commission has correctly interpreted or applied the Commission's regulations, or that the New Mexico Commission's actions complained of here are consistent with (or, alternatively, are inconsistent with) this Commission's regulations.

Joint Status Report ¶ 15, at 5, filed April 1, 2019 (Doc. 35).

[11]The Commission, El Paso Electric, and SPS do not controvert the proffered fact, so the Court deems the fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.")

capacities as Commissioners of the NMPRC, to adopt an implementation plan consistent with federal law." MSJ at 19-20.

1. **The Complaint.**

Great Divide filed its Complaint for Declaratory and Injunctive Relief on February 6, 2019 with the FERC's consent to file a claim in federal court. <u>See</u> Complaint for Declaratory and Injunctive Relief, filed February 6, 2019 (Doc. 1)("Complaint"); First MTD at 4 (citing FERC Order ¶ 18, at 7). Great Divide asks the court to

> [d]eclar[e] that the NM Order violates PURPA and FERC regulations insofar as it places improper obligations on Plaintiffs before EPE is obligated to enter into a contract or other legally enforceable obligation to purchase the output of [the Projects] for the specified term, and for injunctive relief requiring that the NMPRC issue an order that complies with federal law.

Complaint ¶ a, at 13. Great Divide further asks that the Court enjoin

> Defendants to issue a new order implementing FERC's rules under PURPA in a manner consistent with federal law, ruling that Plaintiffs need not construct their Projects and obtain signed interconnection agreements as a prerequisite to the creation of a legally enforceable obligation, and implementing a methodology for determining avoided energy costs calculated at the time the obligation is incurred or offering to resolve disputes between Plaintiffs and EPE regarding the calculation of an avoided cost rate.

Complaint ¶ b, at 13.

2. **The Defendants' First MTD.**

The Commission filed a Motion to Dismiss on March 1, 2019. <u>See</u> Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019

(Doc. 22)("First MTD"[12]).  The Commissioners state that PURPA provides plaintiffs with two mechanisms for challenging state regulatory actions: "(i) as-applied challenges that 'involve[] a contention that the agency's implementation plan is unlawful as it applies to or affects an individual petitioner'; and (ii) as-implemented challenges that 'allege[] that the state agency has failed to comply with its obligation under Section 210(f)(2) of PURPA to devise a plan that implements PURPA and FERC's PURPA-related regulations.'"  Great Divide Wind Farm 2 LLC v. Becenti Aguilar, No. CV 19-0099 JB\CG, 2019 WL 2144829, at 10 (D.N.M. May 16, 2019)("MOO")(quoting First MTD at 4 (citing 16 U.S.C. § 824a-3(g)-(h); Power Res. Grp. v. Pub. Util. Comm'n of Tex, 422 F.3d 231, 233, 235 (5th Cir. 2005); Mass. Inst. of Tech. v. Mass Dep't of Pub. Utils., 941 F. Supp. 233, 237 (D. Mass. 1996)(Lindsay, J.); Greensboro Lumber Co. v. Ga. Power Co., 643 F. Supp. 1345, 1374 (N.D. Ga. 1986)(Moye, J.))).  The Commissioners contend that Great Divide brings an as-applied challenge because the relief that Great Divide seeks would benefit only itself.  See  MTD at 5.  The Commissioners argue,

_____

[12]The Court discerns no differences between Aguilar's Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 19), Byrd's Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 20), Espinoza's Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 21), Fischmann's Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 22), and Hall's Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 23).  Compare Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 19), with Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 20), Defendants Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 21), Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 22) , and Defendants' Joint Motion to Dismiss and Memorandum of Law in Support Thereof, filed March 1, 2019 (Doc. 23).  The Court, accordingly, discusses the documents collectively under the name "First MTD."

therefore, that because Great Divide brings an as-applied challenge, and federal courts have jurisdiction over only as-implemented challenges, the Court does not have jurisdiction over Great Divide's Complaint.  See First MTD at 4-5.

### 3. The First Response.

Great Divide responds.  See Plaintiffs' Response in Opposition to Defendants' Joint Motion to Dismiss, filed March 15, 2019 (Doc. 29)("Response").  While Great Divide agrees that PURPA has different routes for as-applied challenges and as-implemented challenges, it contends that its Complaint raises an as-implemented challenge.  See  Response at 2-3.  It states that rule 570 violates PURPA and its FERC regulations with its ready-to-interconnect requirement, and that this rule is the basis of the NMPRC's "rule of general applicability." Response at 10.

### 4. The Defendants' First Reply.

The Commissioners reply.  See Defendants' Reply to Plaintiffs' Response in Opposition to Defendants' Joint Motion to Dismiss, filed April 1, 2019 (Doc. 34)("First Reply").  The Commissioners argue that Great Divide's challenge is not an as-implemented challenge, because Great Divide asks the Court to overturn the NM Order applying rule 570 rather than overturning rule 570.  See First Reply at 2.  The Commissioners contend that Great Divide only wants the NMPRC to issue a new order and does not want a new rulemaking for rule 570.  See First Reply at 9. The Commissioners contend that Great Divide, which knows that the rulemaking could delay its QFs' financing and construction, argues simultaneously that the Court overturn the NM Order and that its Complaint targets rule 570.  See  First Reply at 10.  The Commissioners argue

that Great Divide's argument is duplicitous and that the Court should dismiss its Complaint.  See First Reply at 10.

### 5.    **The First Hearing.**

The Court held a hearing on May 2, 2019.  See generally Draft Transcript of Hearing at 47:15-21 (taken May 2, 2019)(Amer)("First Tr.")[13].  Great Divide acknowledges the Commissioners' contention that a delay in relief would reduce Great Divide's tax credits.  See First Tr. at 85:6-87:5 (Marks, Court). Great Divide explains that a production tax credit is applied over a Projects' first ten years of production, but that, if construction does not begin by the deadline, the developer's tax credits are "proportional[ly] reduced."  First Tr. at 87:4 (Guy). According to Great Divide, it is deemed for tax purposes to have begun work on the Projects in 2016 and, therefore, must complete the Projects by 2020 to receive the one hundred percent credit.[14]  See First Tr. at 93:21-94:8 (Rucker).

_____

[13]The Court's citations to the transcripts of both hearings refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

[14]The Library of Congress' Congressional Research Service has succinctly explained these tax credits.  See Cong. Research Serv., The Renewable Electricity Production Tax Credit: In Brief (Nov. 27, 2018), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=3&cad=rja&uact=8&ved=2ahUKEwju76CXyILiAhWUvJ4KHfO1BTAQFjACegQIARAC&url=https%3A%2F%2Ffas.org%2Fsgp%2Fcrs%2Fmisc%2FR43453.pdf&usg=AOvVaw0CBXyvST-jNvn-aZVA6dCz ("CRS Report").  Congress enacted the Production Tax Credit for wind facilities in the Consolidated Appropriations Act, Pub. L. 114-113 (2016).  See CRS Report at 1.  The Production Tax Credit is calculated by the kilowatt-hour of energy that a facility generates.  See CRS Report at 1.  A facility may claim the credit once it begins production and for the first ten years after it begins production.  See CRS Report at 1.  The credit amount adjusts each year according to inflation.  See CRS Report at 1.  The maximum tax credit for 2017 and 2018 is 2.4 cents per kilowatt-hour.  See CRS Report at 1.  For 2016, the maximum credit

6. **MOO.**

The Court granted the MTD in part and denied it in part.  See MOO at 1.  The Court

stated that "[t]he parties' dispute revolve[s] around the as-applied/as-implemented issue."  MOO

at 40.  The Court concluded that Great Divide brought the Complaint an as-applied, not an as-

implemented, claim for relief and that, therefore, the Court did not have jurisdiction over the

case.  See MOO at 41.  The Court then stated that it would have jurisdiction over the case if

Great Divide brought "the theory it articulated at the hearing as an as-implemented challenge."

MOO at 47.

First, the Court addressed whether Great Divide brought an as-applied or an

as-implemented claim.  The Court noted that Great Divide's "Complaint does not challenge rule

---

amount was 2.3 cents per kilowatt-hour.  See CRS Report at 1.  The Production Tax Credit for
wind facilities began phasing out in 2017, but wind facilities for which construction begins
before 2020 will qualify for the credit.  See CRS Report at 1.  Wind facilities that began
construction in 2017 will receive eighty percent of the tax credit; facilities that began
construction in 2018 will receive sixty percent of the tax credit; and facilities that begin
construction in 2019 will receive forty percent of the credit.  See CRS Report at 1.
    The Internal Revenue Service ("IRS") provides a safe harbor for wind facilities that begin
construction in 2016 and complete construction "no more than four calendar years after" the year
construction began.  Comm'r, Beginning of Construction for Sections 45 and 48, Notice 2016-31
¶ 3, at 5, https://www.irs.gov/pub/irs-drop/n-16-31.pdf.  See Comm'r, Beginning of Construction
for Purposes of the Renewable Electricity Production Tax Credit and Energy Investment Tax
Credit, Notice 2013-29 § 1, at 1 ("Notice 2013-29"),
https://www.google.com/search?q=Notice+201329+%28Five+Percent+Safe+Harbor%29+irs&ie
=utf-8&oe=utf-8&client=firefox-b-1-ab (establishing the safe harbor for facilities on which
construction begins before January 1, 2014).  Under the safe harbor, the IRS deems construction
to have begun on a wind facility when a developer begins physical work on the project, or when
a developer pays five percent or more of the cost of the facility, and makes "continuous efforts to
advance toward completion of the facility," pursuant to the IRS' regulations.  Notice 2013-29
§§ 4, 5, at 2, 9 (describing the safe harbors).  Accordingly, a wind facility that begins
construction in 2016 and finishes construction in 2020 receives the full Production Tax Credit.

570's lawfulness or the lawfulness of the NMPRC's interpretation of rule 570," but rather "the N.M. Order's application of rule 570 and NMPRC caselaw to it." MOO at 43. The Court pointed out that, at the hearing, Great Divide "concede[d] that rule 570 on its face does not violate PURPA and the FERC regulations." MOO at 43. The Court noted that Great Divide's Complaint similarly does not contend that the NMPRC's interpretation of rule 570 is "the regulatory action that violates PURPA and the FERC regulations." MOO at 43. While the Complaint notes one time that rule 570 does not include the words "legally enforceable obligation," it spent most of its words on "the N.M. Order's effects on the Projects." MOO at 44 (citing Complaint ¶ 31, at 8; id. ¶ 53, at 12). The Court stated that, moreover, Great Divide's argument that the NMPRC did not "provide a methodology after it had concluded that the Projects were not ready for interconnection" focuses on the methodology's application and does not challenge rule 570 or the NMPRC's interpretation of that rule. MOO at 44-45. Citing those portions of the Complaint that "focus on the N.M. Order as it applies to them," the Court concluded that Great Divide made only an as-applied challenge and that the Court, therefore, dismissed the claim for lack of subject matter jurisdiction. MOO at 46.

Next, the Court explained that Great Divide could bring an as-implemented challenge, over which the Court would have jurisdiction. See MOO at 47. The Court explained that the statute gives jurisdiction to federal district courts over "an action against the State regulatory authority or nonregulated electric utility for failure to comply with the requirements of subsection (f)."[15] MOO at 48 (quoting 16 U.S.C. § 824a-3(h)(2)(A)(i))(internal quotation marks

_____

[15]Subsection(f) states:

omitted).  The Court reasoned that the States' obligation to implement lawfully PURPA and the FERC regulations "implicates the entire body of generally applicable law that implements PURPA and the FERC regulations."  MOO at 49.  If the Court concluded that the rule was interpreted invalidly, "a challenge explicitly to the rule and its interpretation effectuates a challenge to the unlawful rule." MOO at 49.  The Court noted that "Great Divide's theories from the Response and the hearing -- respectively, that Rule 570 violates PURPA and the FERC regulations, and that the NMPRC's interpretation of rule 570 violates PURPA and the FERC regulations -- raise as-implemented challenges."  MOO at 50.  The Court stated that, if Great Divide were to bring a claim under either theory,[16] the Court could have jurisdiction over that claim.  The Court stated that Great Divide must amend its Complaint to say that it challenges rule 570 or the NMPRC's interpretation of rule 570, or the Court will dismiss the case without prejudice.[17]  See MOO at 51.

---

Beginning on or before the date one year after any rule is prescribed by the Commission under subsection (a) or revised under such subsection, each State regulatory authority shall, after notice and opportunity for public hearing, implement such rule (or revised rule) for each electric utility for which it has ratemaking authority.

16 U.S.C. § 824a-3(f)(1).

[16]Great Divide can bring a claim that the NMPRC's interpretation of rule 570 violates PURPA and the FERC regulations if that interpretation is considered part of New Mexico's implementation plan.  See MOO at 50.

[17]The Court acknowledges that bringing a claim regarding the NMPRC's interpretation may not give Great Divide timely relief.  See MOO at 50.

7.    **The Amended Complaint.**

Great Divide filed its Amended Complaint for Declaratory and Injunctive Relief, on May 30, 2019 (Doc. 56)("Amended Complaint").  In its Amended Complaint, Great Divide asserts that the Court has jurisdiction over the case "pursuant to 16 U.S.C. § 824a-3(h)(2)(B), because Great Divide, as qualifying facilities, challenge the implementation of PURPA and FERC's regulations under PURPA by a state regulatory authority, the NMPRC."  Amended Complaint ¶ 18 at 4.  Great Divide gives an overview of PURPA and its FERC regulations.  See Amended Complaint ¶¶ 24-29, at 5-6.  Great Divide then defines the NMPRC's implementation plan as consisting of rule 570 and the NMPRC's interpretation of rule 570.  Great Divide points out that the first component of the implementation plan, rule 570, does not "define or use the term 'legally enforceable obligation.'"  Amended Complaint ¶ 32, at 6.  Great Divide then describes an NMPRC case that WWPP filed, in which the NMPRC held that rule 570 meant "that a utility has no obligation to accept a QF's offer and that no legally enforceable obligation is created until the generating facility is constructed, capable of operating safely and commencing delivery of power into the utility system and ready to be interconnected."  Amended Complaint ¶ 33 at 7 (citing Western Water and Power Prod., Ltd., LLC v. Pub. Serv. Co. of NM, NMPRC Case No. 11-00466-UT, Final Order Dismissing Complaint ¶ 18 (NM Pub. Regulation Comm'n Aug. 3, 2016)("WWPP Final Order")).  Great Divide argues that, in both the WWPP case and a 2018 case filed by Great Divide, the NMPRC stated that rule 570's ready-to-interconnect requirement resulted in a utility's purchase obligation beginning at the interconnection date.  See Amended Complaint ¶¶ 33-34, at 7 (citing WWPP Final Order; In the Matter of the Formal Complaint of Great Divide Wind Farm 2 and Great Divide Wind Farm 3 Against El Paso Electric Company,

NMPRC Case No. 18-00268-UT, Final Order Dismissing Complaint Without Prejudice ¶ 8 (Nov. 7, 2018)("NM Order")). Great Divide contends a State regulatory commission that requires more from a QF than a commitment is violating PURPA and its FERC regulations before the creation of a legally enforceable obligation. See Amended Complaint ¶ 35, at 7. Great Divide argues that the NMPRC's ready-to-interconnect requirement therefore violates PURPA and its FERC regulations. See Amended Complaint ¶ 36, at 8.

**8.      The Defendants' Response to the Amended Complaint.**

The Commissioners respond. See Defendants' Answer to First Amended Complaint for Declaratory and Injunctive Relief, filed June 13, 2019 (Doc. 58)("Defendants' Response to Amended Complaint"). The Commissioners assert that the Amended Complaint's jurisdictional statement "appears to contain only assertions of law and does not contain allegations of facts with [sic] require a response from the Defendants." Defendants' Response to Amended Complaint ¶ 20, at 4. The Commissioners admit that rule 570 does not contain the phrase "legally enforceable obligation." After responding to each one of Great Divide's allegations, the Commissioners then raise three affirmative defenses: (i) the doctrines of estoppel, waiver, and laches bar Great Divide's claims in whole or in part; (ii) the doctrine of unclean hands bars Great Divide's claims, and (iii)Great Divide did not mitigate harm because it could have either (a) refiled its complaint against El Paso Electric with the NMPRC or (b) met the ready-to-interconnect requirement. See Defendants' Response to Amended Complaint ¶¶ 38-40, at 4.

**9.    El Paso Electric's Response.**

El Paso Electric responds.   See Intervenor-Defendant El Paso Electric Company's Original Answer to Amended Complaint, filed August 1, 2019 (Doc. 74)("El Paso Electric's Response to Amended Complaint").   In response to the Amended Complaint's jurisdiction statement, El Paso Electric "refer[red] the Court to the language of 16 U.S.C. § 824a-3(h)(2)(B), which "speaks for itself regarding subject matter jurisdiction."   El Paso Electric's Answer to Amended Complaint, ¶ 18, at 3.   El Paso Electric denies all of Great Divide's allegations "inconsistent with the language of statute."   El Paso Electric's Answer to Amended Complaint ¶ 18, at 3.   While El Paso Electric admits that Great Divide is challenging the Commissioners' implementation of PURPA and its FERC regulations, El Paso Electric denies that the Commissioners' implementation plan has violated PURPA or its FERC regulations.   See El Paso Electric Answer to Amended Complaint ¶¶ 18, 20, at 3-4.

**10.    The MSJ.**

Great Divide asks the Court to grant summary judgment on its claim that the NMPRC's implementation of PURPA is unlawful under PURPA and the FERC's PURPA regulations.   See MSJ at 1.   Great Divide argues that both the NMPRC's implementation of PURPA, and the NMPRC's interpretation of rule 570, violate PURPA and the FERC's regulations.

Great Divide begins its argument by noting that rule 570 states that "'[e]ach utility shall purchase power from a qualifying facility from the *date of interconnection* at the utility's avoided cost.'"   MSJ at 15 (quoting N.M. Code R. § 17.9.570.9(A))(emphasis added in MSJ). Great Divide argues that the NMPRC's inclusion of the phrase "date of interconnection" means that the NMPRC interprets PURPA and the FERC's regulations as requiring a utility to enter into

legally enforceable obligation with "a QF only when that energy is available and the QF is interconnected or ready to be interconnected, *i.e.*, at the beginning of that obligations specified term." MSJ at 15. Great Divide argues that this interpretation conflicts with 18 C.F.R. § 292.304(d)(2)'s plain language, because the NMPRC's interpretation does not grant a QF two rights: (i) the right to enter into a legally enforceable obligation with a utility before the specified time period begins; and (ii) the right to enter into a legally enforceable obligation with a utility at the long-term avoided cost rates, calculated at "the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2).

Great Divide cites the FERC order and corresponding regulations implementing PURPA to support its contention that rule 570 conflicts with PURPA and the FERCA's regulations. See MSJ at 16-17. First, Great Divide argues that rule 570 conflicts with the FERC regulation that "state[s] that the certainty regarding the future sale of . . . a QF's power output is needed 'before [the] construction of a facility' so that investors can estimate the expected return on a potential investment." Great Divide's MSJ at 16 (quoting FERC Order No. 69, Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214 12,218 (Feb. 25, 1980)("FERC Order No. 69)). Second, Great Divide argues that rule 570 conflicts with the FERC regulation that states that Congress wrote PURPA with the QFs' need to enter into "contractual commitments based, by necessity, on estimates of future avoided costs" in mind. Great Divide's MSJ at 16 (quoting Order No. 69, 45 Fed. Reg. at 12,224). Great Divide cites these regulations to underscore the FERC's belief in the importance of certainty for QFs, which Great Divide believes that rule 570 ignored. See MSJ at 16.

Great Divide cites a Supreme Court of New Hampshire opinion, which states that "'the FERC has recognized that investors must be able to estimate the expected return on their investment with reasonable certainty before the development of a qualifying facility'" and, therefore, argues a statute like New Mexico's rule 570 that "guts the certainty provided by Section 292.304(d)(2) . . . impedes the development of QFs in violation of the very purpose of PURPA." MSJ at 17 (quoting Pub. Serv. Co. of N.H., 539 A.2d 275, 280 (N.H. 1988)).

Great Divide then argues that the FERC's rulings show that the legally enforceable obligation begins when a QF commits to sell power in the future, and not only when it sells power immediately. See MSJ at 17. In support of this argument, Great Divide cites several FERC cases. See MSJ at 17-18 (citing Grouse Creek Wind Park, LLC, 142 FERC ¶ 61,148 (2009), rehearing denied, 130 FERC ¶ 6,127 (2010)(stating that a legally enforceable obligation under PURPA can predate a contract's signing); FLS Energy, Inc., et al., 157 FERC ¶ 61,211 at 20, 23-26 (concluding that Montana Public Service Commission's requirement that a QF obtain a facilities study or an interconnection agreement before a legally enforceable obligation can exist is inconsistent with PURPA and its regulations); JD Wind 1, LLC, et al., 129 FERC ¶ 61,148 at 25 (2009), rehearing denied, 130 FERC ¶ 61,127 (2010)).

Great Divide next concedes that the FERC has given States the freedom to implement the FERC's regulations as they see fit, but Great Divide cautions that the State's implementation must adhere to the regulation's requirements. See MSJ at 19. Great Divide points out that, if "a state PURPA implementation plan directly conflicts with the requirements of the FERC, as NMPRC's [plan] does, the state commission's interpretation is not entitled to deference." MSJ at 19.

11.     **The Commissioners' Response.**

The Commissioners respond.  <u>See</u> Commissioners' Response at 1.  The Commissioners make two arguments: (i) "PURPA and caselaw have granted states great latitude in implementation rulemaking"; and (ii) "Rule 570 is a proper implementation of PURPA and FERC rules." Defendants' MSJ Response at 3, 9.  The Commissioners address each argument in turn.

First, the Commissioners argue that the FERC gave the NMPRC great latitude in implementing PURPA's regulations.  The Commissioners cite as support the FERC's statement that it would "'afford the state regulatory authorities. . . . **great latitude** in determining the manner of implementation of the [FERC's] rules, provided that the manner chosen is reasonably designed to implement the requirements of FERC's regulations.'"  Commissioners' Response at 5 (quoting 45 Fed. Reg. at 12230-31)(emphasis added in Commissioners' Response).  The Commissioners also cite FERC cases concluding that the States can determine "'the specific parameters of individual QF power purchase agreements, *including the date at which a legally enforceable obligation is incurred under State law.*'"  Commissioners' Response at 5 (quoting <u>West Penn Power Co.</u>, 71 FERC ¶ 61,153, at 16,295 (1995))(emphasis added in Commissioners' Response)(internal quotation marks omitted)(and citing <u>Metro. Edison C. and Penn Elec. Co.</u>, 72 FERC ¶ 61,015, at 61,050 (1995); Order on Clarification, 72 FERC ¶ 61,269 (1995)).

The Commissioners then lay out the "history behind rule 570" and <u>Great Divide vs. EPE</u>, EL17-17-000 (FERC Aug. 27, 2018).  Commissioners' Response at 5.  First, the Commissioners provide rule 570's text that defines a utility's obligation to purchase from a QF.  <u>See</u> Commissioners' Response at 5.  Next, the Commissioners give <u>WWPP</u>'s procedural history.  <u>See</u>

Commissioners' Response to MSJ at 6. In that case, WWPP argued that a legally enforceable agreement began at the time of offer, even though the facility was not yet built, while PNM argued that the legally enforceable obligation would begin only when WWPP's facility was ready to be interconnected. See Commissioners' Response to MSJ at 6. The NMPRC ruled in PNM's favor and dismissed the case, concluding that rule 570's legally enforceable agreement has a ready-to-interconnect prerequisite. See Commissioners' Response to MSJ at 6. The Commission notes that the FERC declined to act in the case and that WWPP did not appeal in federal court, and therefore, the Commissioners argue, the NMPRC's final order in the case is "precedent." Commissioners' Response to MSJ at 7.

The Commissioners next examine Great Divide vs. EPE, 18-00268-UT (NMPRC 2018). In that case, Great Divide asked for a declaratory order stating that: (i) a legally enforceable obligation existed, because it had committed to sell all of its output to El Paso Electric even though its facility was not yet built; and (ii) that El Paso Electric was violating PURPA and the FERC regulations by not recognizing the legally enforceable obligation. See Commissioners' Response to MSJ at 9. The Commissioners argue that the NMPRC dismissed the complaint without prejudice, concluding that rule 570.9's "plain language" states that a legally enforceable obligation begins when a QF is ready to be interconnected. Commissioners' Response to MSJ at 8. According to the Commissioners, when dismissing the complaint, "the NMPRC relied on its own precedent, the 2016 decision in WWPP v. PNM described above." Commissioners' Response to MSJ at 9. The Commissioners emphasize that, in both cases, the FERC concluded that a legally enforceable obligation was created before a facility was built and ready for interconnection. See Commissioners' Response at 9.

The Commissioners' second argument is that "[r]ule 570 is a proper implementation of PURPA and FERCA rules." Commissioners' Response to MSJ at 9. The Commissioners argue that their rule "is consistent with rules in other states that have been upheld by federal court." Commissioners' Response at 9. The Commissioners argue that Great Divide is equating the ready-to-interconnect requirement with the signed-interconnection-agreement requirement struck down in other States. See Commissioners' Response at 10. The Commissioners dispute that analogy, stating that rule 570 requires only readiness to interconnect. See Commissioners' Response at 10. The Commissioners note that rule 570 does not use the term "legally enforceable obligation," but they argue that omission is not determinative, because "legally enforceable obligation" means "when a utility's obligation to purchase a qualifying facility's output begins." Commissioners' Response at 10.

The Commissioners then cite cases from other federal district courts to support their argument that States have sufficiently broad authority to implement the regulations "with respect to the approval of purchase contracts between utilities and qualifying facilities." Commissioners' Response at 11 (citing Exelon Wind v. Nelson, 766 F.3d 380 (5th Cir. 2014)). The Commissioners support their conclusion with Exelon Wind v. Nelson, a case in which the United States Court of Appeals for the Fifth Circuit determined that: (i) the FERC regulations did not give an automatic right to all QFs to legally enforceable obligations; and (ii) the State requirement that QFs produce "firm power" before a legally enforceable obligation was established was not a violation of PURPA and the FERC regulations. Commissioners' Response at 11-12.

The Commissioners then cite another case from the Fifth Circuit, <u>Power Resource Group Inc. v. Public Utility Commission of Texas</u>, 422 F.3d 231 (5th Cir. 2005)("<u>Power Resource Group</u>"), to support its proposition that its rule 570 comports with PURPA and the FERC regulations, <u>see</u> Commissioners' Response at 12. The Commissioners note, that in <u>Power Resource Group</u>, the Fifth Circuit stated that a Texas regulation that requires a facility to be within ninety days of producing power in order to establish a legally enforceable obligation was a "meaningful" implementation of PURPA. Commissioners' Response at 12-13 (quoting <u>Power Res. Grp. v. Pub. Util. Comm'n of Tex.</u>, 422 F.3d at 238. The Commissioners adopt the Fifth Circuit's reasoning that other States' lack of prerequisites does not obligate New Mexico to have the same lack of prerequisites. <u>See</u> Commissioners' Response at 13 (citing <u>Power Res. Grp. v. Pub. Util. Comm'n of Tex.</u>, 422 F.3d at 238).

The Commissioners next undermine Great Divide's reliance on its cited cases, <u>Grouse Creek Wind</u> and <u>JD Wind</u>. <u>See</u> Commissioners' Response at 15. The Commissioners first note that Great Divide's cited case, <u>JD Wind</u>, later became the <u>Exelon Wind</u> case that the Commissioners use as support. <u>See</u> Commissioners' Response at 15. The Commissioners argue that appeals supersede both of Great Divide's cited FERC decisions. <u>See</u> Commissioners' Response at 15. The Commissioners then factually distinguish Great Divide's cases. <u>See</u> Commissioners' Response at 15. The Commissioners differentiate <u>Grouse Creek Wind</u> from the case by noting that Idaho's prerequisite for the creation of a legally enforceable obligation was a fully executed contract. <u>See</u> Commissioners' Response at 15. The Commissioners further note that an appeal to the Idaho Supreme Court, <u>Idaho Power v. Idaho PUC</u>, 155 Idaho 780, 316 P.3d 1276 (2013), superseded <u>Grouse Creek Wind</u>. <u>See</u> Commissioners' Response at 15-16. The

Commissioners observed the Idaho Supreme Court concluded that the IPUC could require that a signed contract, or a mature project and a failure to negotiate with the utility, exist before the establishment of a legally enforceable obligation. <u>See</u> Commissioners' Response at 16. The Commissioners then note that the phrase "legally enforceable obligation" is only in the FERC regulations, not in PURPA, and that the Idaho Supreme Court found that the term is meant to "prevent a utility from circumventing the requirement that provide capacity credit for a QF merely by refusing to enter into a contract with the QF." Commissioners' Response at 16.

The Commissioners then distinguish <u>FLS Energy</u> from the case at issue. The Commissioners state that <u>FLS Energy</u> "cannot be support for [the] Great Divide's claims" because the Montana rule in <u>FLS Energy</u> is not analogous to rule 570. <u>See</u> Commissioners' Response at 16. The Montana rule required that a QF obtain an executed paper interconnection agreement before the legally enforceable obligation's establishment. <u>See</u> Commissioners' Response at 16. The Commissioners note that, even though the FERC did not strike down rule 570 when the case appeared before it, the FERC concluded that the Montana rule was inconsistent with PURPA and the FERC regulations only a month before Great Divide's case came before FERC. <u>See</u> Commissioners' Response at 17.

### 12. <u>El Paso Electric Company's Response</u>.

El Paso Electric Company responds. <u>See</u> El Paso Electric's Response at 1. El Paso Electric begins its response with a summary of PURPA's legislative history and its related rules and regulations. <u>See</u> El Paso Electric's Response at 2-7. El Paso Electric then makes five arguments. <u>See</u> El Paso Electric's Response at 7-18.

First, El Paso Electric begins by disputing Great Divide's interpretation of the controlling law, 18 C.F.R. § 292.304(d).  See El Paso Electric's Response at 8.  El Paso Electric lays out its interpretation of 18 C.F.R. § 292.304(d).  See El Paso Electric's Response at 8.  It reads 18 C.F.R. § 292.304(d) as a statute that provides a QF with two choices.  See El Paso Electric's Response at 8.  El Paso Electric first argues that, under 18 C.F.R. § 292.304(d)(1), the QF can elect to "sell its energy on an 'as available' basis, meaning that it has a right to sell its output to the utility, but the [QF] is under no obligation to sell its output to the utility if it can find a better price elsewhere." El Paso Electric's Response at 8 (quoting 18 C.F.R. § 292.304(d)(1)).  Second, under 18 C.F.R. § 292.304(d)(2), the QF can

> impose a purchase obligation on the utility for a "specified term," and in return the qualifying facility has an obligation to sell its output to the utility for that "specified term." But contrary to the implication in Great Divide's Motion for Summary Judgment, nothing in that language requires a state regulatory authority to promulgate a rule allowing the [QF] to impose the legally enforceable obligation on the utility at any time the [QF] chooses.

El Paso Electric's Response at 8.

El Paso Electric acknowledges that there is a temporal element in 18 C.F.R. § 292.304(d)(2) -- "prior to the beginning of the specified term" -- but states that this phrase refers to the time when the QF makes the decision as to how the utility will pay the QF for the energy and not the time when the legally enforceable obligation is created.  See El Paso Electric's Response at 8-9.  El Paso Electric states this requirement is meant to ensure that a QF does not change payment methods to whichever method is most advantageous at the time at the expense of the utility.  See El Paso Electric's Response at 9.  El Paso Electric further concludes

that the rule is "silent" when a legally enforceable obligation is created because the FERC "left that decision up to the states." El Paso Electric's Response at 10.

Second, El Paso Electric argues that caselaw construing 18 C.F.R. § 292.304(d) controverts Great Divide's argument. El Paso Electric notes that the Fifth Circuit has construed 18 C.F.R. § 292.304(d)'s language, and that in construing the language, it rejected arguments similar to Great Divide's arguments in the present case. See El Paso Electric's Response at 10-11 (stating that Power Resource Group's rejected argument that requiring a QF to be within ninety days of operation before a legally enforceable obligation is established violates PURPA is "essentially identical" to Great Divide's argument that requiring interconnectedness before a legally enforceable obligation is established violates PURPA). El Paso Electric then notes that the Fifth Circuit discussed cases from several jurisdictions with differing outcomes to demonstrate that the "'FERC has given each state the authority to decide when [a legally enforceable obligation] arises in that state.'" El Paso Electric's Response at 11 (quoting Power Res. Grp. v. Pub. Util. Comm'n of Tex., 422 F.3d at 239). Finally, El Paso Electric reiterates the Fifth Circuit's conclusion that, if the FERC wanted to delineate more specific requirements for the creation of a legally enforceable obligation, it would have done so. See El Paso Electric's Response at 11 (citing Power Res. Grp. v. Pub. Util. Comm'n of Tex., 422 F.3d at 239). El Paso Electric then cites Exelon Wind, another Fifth Circuit case, for the proposition that the States have broad discretion to determine requirements for a legally enforceable obligation. See El Paso Electric's Response at 12. El Paso Electric notes that, while these Fifth Circuit cases are not authoritative, the cases are persuasive and that Great Divide neglects to distinguish them. See El Paso Electric's Response at 12.

Third, El Paso Electric argues that, because the FERC gives States broad discretion in deciding the requirements for a legally enforceable obligation, States can weigh competing interests when deciding these requirements. <u>See</u> El Paso Electric's Response at 13. El Paso Electric supports its argument with policy reasons: (i) a legally enforceable obligation's establishment before a QF's facility is constructed may lead to the utility committing to purchase energy from a facility that is never built; and (ii) a utility and its customers may have to pay higher costs to recoup losses or to file a lawsuit against a reneging QF. <u>See</u> El Paso Electric's Response at 13. El Paso Electric concedes Great Divide's counterpoint that policy dictates a QF have certainty from utilities in order to obtain funding for their construction, but El Paso Electric states that this policy is one consideration that States are permitted, but not obligated, to weigh when deciding the legally enforceable obligation prerequisites. <u>See</u> El Paso Electric's Response at 14.

Fourth, El Paso Electric argues that "Great Divide's reliance on FERC Declaratory Orders is misplaced." El Paso Electric's Response at 14. El Paso Electric notes that Great Divide has relied upon the FERC's rulings that a legally enforceable obligation arises when a QF commits to sell power in the future, and not when the QF is ready to sell power. <u>See</u> El Paso Electric's Response at 14 (citing Great Divide MSJ at 17.) El Paso Electric argues that Great Divide cannot rely upon these FERC rulings because: (i) declaratory orders are "nothing more than [] informal guidance document[s]"; (ii) the FERC declaratory orders rely on the reasoning from <u>JD Wind 1</u>, reasoning the Fifth Circuit later rejected in <u>Exelon Wind</u>; and (iii) FERC declaratory orders are not notice-and-comment rulemaking procedures and, therefore, do not replace existing FERC rules. El Paso Electric's Response at 14-16.

Fifth, El Paso Electric argues that, for Great Divide's argument that a QF can establish a legally created obligation at any time, Great Divide took sections of Order No. 69 out of context. See El Paso Electric's Response at 17. El Paso Electric argues that Great Divide mistakes the certainty that QFs are entitled to regarding future sales as the financial certainty needed to construct a facility, but the FERC meant for certainty to "refer to the utility's obligation to file its avoided cost estimates with the state regulatory agency under 18 C.F.R. 292.302." El Paso Electric's Response at 17. El Paso Electric also argues that Great Divide misinterprets the part of Order No. 69 that mentions "contractual commitments based, by necessity, on estimates of future avoided costs," and El Paso Electric states that the provision "means that FERC does not consider it a violation of PURPA if the [QF] is able to lock in estimated avoided costs that may ultimately differ from the utility's actual avoided costs." El Paso Electric's Response at 17 (quoting Order No. 69, at 45 Fed. Reg. 12, 224). El Paso Electric last argues that Great Divide mischaracterizes Pub. Serv. Co. of N.H. and Applied Energy Servs., Inc. v. Okla. Corp. Comm'n. as addressing whether the state must permit a QF to establish a legally enforceable obligation before the facility is built, when in fact, neither case addressed that issue. See El Paso Electric's Response at 17.

13. **Southwestern Public Service Company's Response.**

Southwestern Public Service Company ("SPS") responds. SPS' Response at 1. SPS makes three arguments: (i) the NMPRC's implementation of rule 570 was a "reasonable exercise" of discretion that PURPA provides states; (ii) Great Divide relies upon FERC declaratory orders that do not merit deference; and (iii) Great Divide's interpretation of PURPA

is flawed.  See SPS' Response at 6.  SPS addresses each argument in turn.  See generally SPS' Response.

First, SPS argues that the NMPRC reasonably exercised its discretion under PURPA when implementing rule 570.  See SPS' Response at 2-4.  To support this argument, SPS cites a FERC decision and two Fifth Circuit cases.  See SPS' Response at 2-4.  SPS first points to a FERC decision for support that says that "it is up to the States, not this Commission, to determine the specific parameters of individual QF power purchase agreements, including the date at which a legally enforceable obligation is incurred under State law."  SPS' Response at 2 (quoting West Penn Power Co., 71 FERC ¶  61,153, at 612,495.  SPS then analogizes the ninety-day requirement in Power Res. Grp. v. Pub. Utility Comm'n. of Tex. to the ready-to-interconnect requirement in the present case, noting that the Fifth Circuit concluded that the first requirement was consistent with PURPA.  See SPS' Response at 2-3.  Finally, SPS notes that the Fifth Circuit affirmed a state-created prerequisite for a legally enforceable obligation in Exelon Wind, which SPS argues demonstrates that States have discretion to "'define the parameters for when a qualifying facility may form a Legally Enforceable Obligation.'"  SPS' Response at 4 (quoting Exelon Wind 1, LLC v. Nelson, 766 F.3d at 385).

Second, SPS argues that the Court should not defer to the FERC declaratory orders because the orders are factually distinguishable from the present case.  See SPS' Response at 4.  SPS first distinguishes FLS Energy, Inc. and Applied Energy from the present case by noting that the rules at issue in those cases required an executed agreement with a utility before the establishment of a legally enforceable obligation.  See SPS' Response at 5.  In contrast, SPS argues, the requirement at issue in this case does not include an executed agreement.  See SPS'

Response at 6. SPS next distinguishes <u>Grouse Creek</u> by noting that the decision in <u>Grouse Creek</u> was fact-specific and thus inapplicable to the present case. <u>See</u> SPS' Response at 5. Finally, SPS argues that all of these declaratory orders should "be treated as informal guidance letters." SPS' Response at 5 (citing <u>Power Dev. Co., LLC v. Colo. Pub. Util. Comm'n.</u>, 2018 WL 4368612, *8 (June 8, 2018)).

Third, SPS argues that Great Divide's interpretation of PURPA is flawed. <u>See</u> SPS' Response at 6. SPS argues that Great Divide's reading of 18 C.F.R. § 292.304(d) renders the first provision of 18 C.F.R. § 292.304(d)(2) superfluous, because its reading would mean that the regulations provided the option for the QF to provide power on an as-available basis twice -- once in 18 C.F.R. § 292.304(d)(1) and once in 18 C.F.R. § 292.304(d)(2). <u>See</u> SPS' Response at 6. SPS concludes that Great Divide's reading would be in conflict with the canon of interpretation mandates that a text's reading to render any part of the text superfluous. <u>See</u> SPS' Response at 6.

**14.     <u>Great Divide's Reply.</u>**

Great Divide replies. <u>See</u> Plaintiffs' Reply to Defendants' and Intervenors' Oppositions to Plaintiff's Motion for Summary Judgment, filed August 15, 2019 (Doc. 77)("Great Divide's Reply"). Great Divide makes six arguments in response to the Defendants' and Defendant-Intervenor's motions. <u>See</u> Great Divide's Reply at 2-38. Great Divide addresses each argument in turn. <u>See</u> <u>generally</u> Great Divide's Reply.

First, Great Divide argues that Congressional policy dictates that PURPA should be interpreted in a way that encourages, not discourages, alternative energy sources' development. <u>See</u> Great Divide's Reply at 3. Great Divide argues that permitting a state to not recognize

legally enforceable obligations for a subset of QFs undermines PURPA's purpose to encourage the alternative energy sources' development.  <u>See</u> Great Divide's Reply at 3.  Second, Great Divide argues that 18 C.F.R. § 292.304(d)'s text entitles all QFs to establish a legally enforceable obligation with a utility at rates calculated at the time the obligation is incurred and before the start of the specified term.  <u>See</u>  Great Divide's Reply at 5.  Great Divide counters the assertion that its reading of 18 C.F.R. §  292.304(d) is incorrect by arguing that 18 C.F.R. § 292.304(d), as part of a regulatory scheme, must be read in conjunction with 18 C.F.R. § 304 and all other parts of the regulatory scheme.  Great Divide contends that the regulatory scheme's other provisions do address QF arrangements, including "relationship to avoided costs."  Great Divide's Reply at 5 (quoting 18 C.F.R. § 292.304(b)(5)).  Great Divide further argues that nothing in the PURPA's text or in the FERC regulations supports the argument that a legally enforceable obligation is available only to QFs that have met certain requirements.  <u>See</u> Great Divide's Reply at 6.

Great Divide next argues that, while States have discretion in implementing the FERC's rules, PURPA's purpose limits that discretion.  <u>See</u> Great Divide's Reply at 17.  Great Divide states that the Commissioners' proffered three cases, upon which the Commissioners rely for the proposition that States have absolute discretion, do not support  that proposition; rather, according to Great Divide, these cases "stand for the unremarkable proposition that States have discretion to determine when an LEO arises, but subject to the terms of FERC's regulations and only to encourage the development of QFs."  Great Divide's Reply at 17 (citing <u>West Penn Power. Co.,</u> 71 ¶  FERC 61,153; <u>Jersey Central Power & Light Co</u>, 73 FERC 61,092 (Oct. 17, 1995); <u>Metro. Edison Co.; Pennsylvania Elec. Co.</u>, 72 FERC 61,015 (July 6, 1995)).

Great Divide next argues that the Fifth Circuit cases are neither binding nor persuasive. See Great Divide's Reply at 26. Great Divide argues that these two Fifth Circuit decisions, Power Resource Group and Exelon Wind, are not binding, because the present case is in the Tenth Circuit. See Great Divide's Reply at 26. Great Divide then sets out its reasons why the Fifth Circuit cases are not persuasive. See Great Divide's Reply at 26-28. First, Great Divide argues, the Fifth Circuit's reasoning undermines PURPA's purpose and the FERC regulations' purpose. See Great Divide's Reply at 26-27. Great Divide states that the Fifth Circuit erred by not deferring to the FERC's decisions, because the Fifth Circuit concluded that the FERC's declaratory orders were "informal 'opinions'" not meriting deference. Great Divide's Reply at 27 (quoting Exelon Wind, 766 F.3d at 392). Great Divide notes that these declaratory orders were unlike "internal materials [or] informal opinion letters," because they resulted from "formal FERC dockets, to which interest parties can and do intervene and present argument." Great Divide's Reply at 27. Great Divide argues that the Fifth Circuit "used its own prior holding as a bootstrap to find the FERC's declaratory orders are [] not entitled to deference," but that this action is improper, because "the fundamental principle underlying the Supreme Court decision in *Christensen* is to prevent an agency 'under the guise of interpreting a regulation to create de facto a new regulation' that is at odds with the plain language of the actual promulgated regulation." Great Divide's Reply at 27 (quoting Christensen v. Harris County, 529 U.S. 576, 588 (2000)). Moreover, Great Divide argues, the Fifth Circuit ignored the regulations' plain language in its decisions, and, even if the Fifth Circuit had concluded that the language is unambiguous, it still "ignor[ed] the purpose of PURPA . . . , the clear direction of Order No. 69, and the requirement that a state implementation plan must reasonably implement PURPA and

FERC's requirements." Great Divide's Reply at 28 (citing <u>Am. Paper Inst. Inc. v. Am. Elec.</u> <u>Power Serv. Corp.</u>, 461 U.S. 402, 415 (1982)). Great Divide notes that the FERC gave "no heed to the [Fifth's Circuit's divergent approach] and ratif[ied] its own standard on the creation of a legally enforceable obligation." Great Divide's Reply at 28 (citing <u>Windham Solar LLC & Allco</u> <u>Fin. Ltd.</u> 157 FERC ¶ 61,134, n.7 and accompanying text (2016)). Great Divide also cites two district court decisions, both of which were affirmed on appeal, that concluded that "an invalid state implementation plan at issue was not entitled to any deference at all." Great Divide's Reply at 28 (citing <u>Winding Creek Solar LLC v. Peevey</u>, 293 F. Supp. 3d 980, 991 (N.D. Cal. 2017); <u>Allco Renewable Energy Ltd. v. Mass. Elec. Co.</u>, 208 F. Supp. 3d 390 (D. Mass. 2016)).

Great Divide next argues that rule 570 does not "attempt to implement FERC's requirements" regarding a legally enforceable obligation's establishment and the rates a QF can charge. Great Divide's Reply at 29. Great Divide observes that rule 570 omits the phrase "legally enforceable obligation," and all of the "multilayered and complex requirements embedded in FERC's linchpin regulation, Section 292.304(d)." Great Divide's Reply at 30. Great Divide points out that, by issuing a 2012 notice of proposed rulemaking to amend rule 570 to include definitions of "as available" and "legally enforceable obligation," the NMPRC acknowledged that it omitted this "linchpin" FERC regulation. Great Divide at 30-31. According to Great Divide, the notice of proposed rulemaking was meant to make rule 570 "'*consistent with current federal and state law*,'" Great Divide's Reply at 31 (quoting <u>In re</u> <u>Adoption of a Proposed Rule Governing Cogeneration and Small Power Production</u>, No. 12-00332-UT, Notice of Proposed Rulemaking (withdrawn Sept. 27, 2012))(emphasis added in Reply), and attempts to add language that provides that "each facility shall have the option, at its

election to provide power pursuant to an LEO, and at avoided costs calculated at the time the LEO was incurred," Great Divide's Reply at 31. No final rule was adopted. <u>See</u> Great Divide's Reply at 32. Great Divide argues that the notice of proposed rulemaking, which Great Divide contends is an admission that rule 570 is inconsistent with federal law, cannot be reconciled with the Commission's current stance that rule 570 is consistent with federal law. Great Divide argues that this inconsistency suffices as a basis for finding rule 570 invalid under federal law. <u>See</u> Great Divide's Reply at 31- 32.

Great Divide next argues that the NMPRC's interpretation of rule 570(A) is "nothing more than a pretext to frustrate the development of New Mexico QFs, which accedes to the preferences of the utilities NMPRC regulates." Great Divide's Reply at 32. Great Divide states that, because rule 570 does not address the PURPA requirements, the Commissioners are "left with no choice but to ask the Court to accept that its application of the language of Rule 570.9(A) in two recent QF cases before it, first <u>WWPP</u> and then <u>Great Divide</u>, constitutes a valid, comprehensive state PURPA implementation plan." Great Divide Reply at 32. Great Divide argues, however, that the NMPRC's interpretation in those cases does not satisfy the FERC standard for a State implementation plan, which is that the plan must be "reasonably designed to implement PURPA" and does "not fail to provide the required encouragement" for QF development. Great Divide Reply at 34. Great Divide states that these interpretations do not satisfy the FERC standard, because: (i) rule 570.9(a)'s text omits the "key requirements" of stating when a QF will pay the rate under a legally enforceable obligation, the rate at which the QF will pay, and how the rate will be calculated; (ii) a limit on the ability to establish a legally enforceable obligation to QFs ready to interconnect does not encourage QF development;

(iii) permission for a utility to wait until a facility has been built to enter into a legally enforceable obligation "eviscerate[s]" a QF's right to seek a legally enforceable obligation; and (iv)

> a state implementation plan that says a QF can only choose avoided costs calculated upon interconnection to a utility contradicts FERC's Section 292.304 that gives all QFs the option to calculate the rates the utility must pay *before* the term of the LEO commences and at the time the LEO is incurred.

Great Divide Reply at 34-35.

Finally, Great Divide argues that NMPRC's rule 570 does not merit deference and the FERC's not-to-act decision has no relevant legal consequence. See Great Divide Reply at 36. In addressing the first part of this argument, Great Divide observes that the Commissioners neglected to say how their rule 570 fulfills the FERC's requirements. See Great Divide Reply at 36. Great Divide proffers an explanation for this omission: "[Rule 570], on its face, fails to implement key parts of FERC's requirements, conflicts with other key parts, and otherwise frustrates the very purpose of PURPA." Great Divide Reply at 36. In addressing the second part of this argument, Great Divide observes that the Commission described WWPP as "precedent," even though the FERC stated in its Great Divide order that a notice of intent not to act "cannot be read to mean that the commission has accepted or agreed with (or alternatively, rejected or disagreed with) any argument made by any party. . . . [T]he Commission has not ruled on the issues, and such issues may not be considered as having been so decided as to constitute precedents." Great Divide Reply at 37.

15. **The Hearing.**

Great Divide opened its arguments by asking the Court to declare rule 570 invalid as an unreasonable implementation of PURPA and of the FERC's regulations. See Draft Transcript of Hearing at 6:19-6:24 (Guy), (taken at October 2, 2019)("Second Tr.").[18] Great Divide noted that rule 570 contravenes PURPA's purpose of encouraging QF development and that, as a result, "New Mexico does not have a robust renewable QF market" and, to Great Divide's knowledge, "no LEO has ever been imposed on any recalcitrant utility in New Mexico by the NMPRC." Second Tr. at 7:15-18 (Guy). Great Divide opined that rule 570 has had no effect on the business relationship between utilities and QFs, which is problematic in light of New Mexico's "monopsony situation." Second Tr. at 8:2-11 (Guy). Great Divide emphasized that the monopsony situation makes it important for QFs, and not utilities, to have control over the indicia of readiness to establish a legally enforceable obligation, and asked the Court to provide guidance to the NMPRC regarding the appropriate indicia to determine a QF's commercial viability and financial commitment. See Second Tr. at 7:15-10:15 (Guy). Great Divide asked the Court if the Court had a chance to read the FERC's notice of proposed rulemaking, and the Court answered affirmatively and asked Great Divide to explain its significance. See Second Tr. at 10:15-10:20 (Guy, Court). Great Divide explained that paragraph 134 of the proposed rulemaking says that the FERC has granted the States authority to determine the criteria for a legally enforceable obligation's establishment. See Second Tr. at 10:15-11:6 (Guy). Great

---

[18]The Court's citations to the transcripts of both hearings refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

Divide noted that paragraphs 135-142 are "entirely consistent with the plants position"; that these paragraphs indicate that the states do not have unlimited discretion; and "that states that have set unreasonable obstacles to the development of QFs are running directly afoul of PURPA, Congress' mandate, and FERC's requirements." Second Tr. at 11:6-25 (Guy). The Court observed that Great Divide was making a policy argument, and asked Great Divide to point out the statutory text upon which it was relying. Tr: 15:3-15 (Court). Great Divide responded that it was relying on: (i) 16 USC § 824(a)-3(a), which says that Congress instructed the FERC to encourage QF development; (ii) Order No. 69, which says that when States are given "great latitude" in implementing the rules;[19] (iii) Order No. 69, which also says that the States must implement the FERC rules in a "reasonably designed" manner; and (iv) § 292.304(d), which states that "each" QF "shall" have the option of a legally enforceable obligation for the delivery of energy or capacity over a specified term. Second Tr. at 15:16-18:25 (Guy).

The Court expressed its concern that it is not the appropriate venue to resolve this issue due to the tight timeframe. See Second Tr. at 20:20-23 (Court). Great Divide assured the Court that the Commissioners will "acknowledge the Court's ruling and act on that [ruling]," and that the timeline would be "very feasible." Second Tr. at 20:24-21:1; 21:19-25 (Guy). The Court then expressed another concern, which is that Great Divide is asking the Court to write its own rule or regulation, a task not suited to the judiciary. See Second Tr. at 22:9-15 (Court). Great Divide clarified that it was asking the Court only to limit requirements that the NMPRC could

---

[19]Even though Great Divide cites this text in their response to the Court, it seems as if they are actually pointing out that the Commission is relying on this text, and not that Great Divide is relying on this text. See Second Tr. at 16:9-23 (Guy)(stating that "that's what they rely on").

impose and that the NMPRC itself could determine the criteria it could require from QFs.  See Second Tr. at 22:15-23:7 (Guy).  The Court stated that it was "having trouble seeing in the regs and the statute something that says that somebody ought to be defining the stage the entity has to be before it's required to . . . be an LEO,"  Second Tr. at 23:8-23:23 (Court), and asked Great Divide to point to corresponding text, see Second Tr. at 24:1-2 (Court).  Great Divide reiterated that 18 C.F.R. § 292.304(d) requires that "each" QF "shall" have the payment option.  Second Tr. at 24:21-25 (Guy).  The Court responded that Great Divide was asking the Court to define a QF, but that the definition is "a spectrum and New Mexico has chosen where on that spectrum they want it."  Second Tr. at 25:14-25 (Guy, Court).  The Court requested that Great Divide point to the text that states a QF "can be an unbuilt facility."  Second Tr. at 26:9-10 (Court).  Great Divide pointed to 18 C.F.R. § 292.207, which "permits a proposed facility to self-certify as a QF,"  Tr. 27:25-28:4 (Guy), and to 18 C.F.R. § 292.304(d), which states "each QF shall be entitled to ask for an LEO,"  Second Tr. at 28:20-24 (Guy).

The Court reiterated that it did not see any text defining QF.  See Second Tr. at 30:17-20. Great Divide skirted the text to elaborate on its policy argument that PURPA's definition of a QF must include not-yet-constructed facilities or else the statute would not further its intended purpose of developing new facilities.  See Second Tr.  at 31:21-32:11; 33:7-34:10 (Guy).  Great Divide offered to brief the issue whether the regulations, Order No. 69, and PURPA mandate the "development of QFs."  Second Tr. at 34:13-17.   The Court repeated that it still does not see in the regulations "just a pure definition of qualifying facility."  Second Tr. at 34:20-21.  Great Divide cited 16 U.S.C. § 2824, which it said talks about "the tracing facility," and then repeated its arguments from its motion regarding the notice of proposed rulemaking and Order No. 69.

Second Tr. at 39:18-40:19 (Guy). The Court countered that the FERC cases Great Divide cites are about "situations where the states were requiring LEOs that were inconsistent with PURPA, rather than" the situation to be resolved in this case, which is whether the State is requiring too much from a QF before it can enter into a legally enforceable obligation with a utility. Second Tr. at 40:20-41:3 (Court). Great Divide conceded that distinction but emphasized that those FERC decisions concern States imposing requirements inconsistent with PURPA. See Second Tr. at 40:6-23. Great Divide also conceded that the FERC does not give requirements and instead delegates that power to the States, but underscored that the issue in this case is whether the States have taken their discretion too far away from PURPA's purpose. See Second Tr. at 43:13-20 (Guy). The Court then inquired again as to how a favorable opinion would help Great Divide "if the [C]omission is going to be able to go back and promulgate a rule." Second Tr. at 44:21-24 (Court). Great Divide acknowledged that the timeframe made things difficult for them, but stated that the NMPRC has elected to implement PURPA on a case-by-case basis, and therefore the NMPRC could "move quickly" with "good faith" and "direction from the Court." Second Tr. 45:20-46:16 (Guy).

The Court then addressed El Paso Electric. See Second Tr. 49:9 (Court). The Court asked El Paso Electric to give its thoughts on how the NMPRC's rule 570 aids in Congress' purpose of developing more QFs. See Second Tr. 49:11-25 (Court). The Court emphasized to El Paso Electric that the case-by-case route NMPRC has elected to take has resulted in the construction of "zero" QFs. Second Tr. at 50:2-52:15 (Court, Moss). The Court pressed El Paso Electric for an example of a situation in which a QF could obtain funding with a legally enforceable obligation until El Paso Electric admitted that it could not think of an example. See

- 37 -

Second Tr. at 52:16-53:7 (Court, Moss). El Paso Electric stated that it wanted to detangle two issues that it alleges Great Divide conflates: (i) whether a FERC regulation prevents the NMPRC from adopting rule 570; and (ii) whether a State violates the FERC regulations and PURPA if the State "do[es not do] everything in its power to encourage QF development." Second Tr. at 54:3-11 (Moss). When the Court stated that it finds the first point troubling, El Paso Electric asked the Court whether anything in the FERC regulations requires something different than rule 570. See Second Tr. at 54:12-22 (Court, Moss). The Court responded that the language in 18 C.F.R. § 292.304 regarding "self-certification" "seem[s] to have existing or a proposed facility," so it gave the Court "pause." Second Tr. at 55:7-15 (Court). El Paso Electric cautioned the Court that mulling over whether an unconstructed facility can be a QF is fruitless, because it is already established that an unconstructed facility can be a QF. See Second Tr. at 55:24-56:4 (Moss). El Paso Electric directed the Court instead to look at 18 C.F.R. § 292.304(d), which does not define the criteria for establishing an LEO. See Second Tr. at 56:15-22. (Moss).

The Court clarified that the issue is that the PURPA regulations do not specify when a legally enforceable obligation "must" be established, and not when it can be established -- a distinction El Paso Electric demurred. Second Tr. at 57:4-19 (Court). El Paso Electric believed that the issue is "whether a QF can establish a legally enforceable obligation by just saying [it is] establish[ing] a legally enforceable obligation." Second Tr. at 58 3-8 (Moss). El Paso Electric pointed to paragraph 138 in the Notice of Proposed Rulemaking, which it argued supports the proposition that the "FERC clearly doesn't believe that an QF gets [to] form [a] legally enforceable obligation just by saying so." Second Tr. at 58:11-23 (Moss). The Court and El Paso Electric both agreed that the proposed rule is similar to what Great Divide is asking the

Court to do, but El Paso Electric assured the Court that the FERC is "well underway with that process." Second Tr. at 59:22-60:5 (Moss). The Court wondered if there would be an issue with it ruling in Great Divide's favor if "that's all [Great Divide] wants . . . and that's what FERC is saying and we're all interpreting the same statute." Second Tr. at 61:1-5 (Court). El Paso Electric countered that "we're not there yet" before switching to a textual argument. Second Tr. at 61:6-7 (Moss). El Paso Electric pointed to PURPA's Section 210, which states that "the [C]omission [will] revise such rules as it determines necessary to encourage cogeneration and small power project[;]" the El Paso Electric interpreted this provision as requiring only the encouragement of QFs when necessary. Second Tr. at 61:17-19 (Moss). El Paso Electric further argued that the FERC included requirements that did not encourage QFs. See Second Tr. at 61:24-62:1 (Moss). The Court asked for an example, so El Paso Electric noted that the text includes mandates such as "periods during which purchases are not required" and an obligation for each QF "to pay any intersection cost with the state regulatory authority," which El Paso Electric believed demonstrate that the FERC was trying to "strike a balance between utilities [and] their customers on one hand and the QFs on the other hand." Second Tr. at 62:2-63:9 (Court, Moss). El Paso Electric then analogized the rule in Power Resource Group with rule 570 and underscored that the Fifth Circuit's reasoning in Power Resource Group is applicable in this case. See Second Tr. at 63:24-64:12 (Moss).

El Paso Electric then made a canon-of-interpretation argument that, if the FERC wanted to have the rule that a QF can establish a legally enforceable obligation at any time, it would have done so and "in fact, now it says maybe it will." Second Tr. at 64:18-25 (Moss). El Paso Electric reminded the Court that the issue before the Court has come before the FERC "at least

[three] times" and that the FERC always "chose not to do anything about it." Second Tr. at 65:3-10 (Moss). El Paso Electric wondered "how the Court could strike down a rule that doesn't violate a FERC regulation," and the Court acknowledged that it had been considering that issue. See Second Tr. at 65:16-23 (Court, Moss).

El Paso Electric again pointed to 18 C.F.R. § 292.304(d)'s text and observed that the text mentions time periods only in the context of calculating rates, and the text never mentions time periods in the context of when a legally enforceable obligation arises. Second Tr. at 67:11-68:6 (Moss). El Paso Electric noted that Great Divide's desired remedy must be that the FERC adopts the proposed rule, but that the FERC already has said it will "do something about [the rule,] at least [it will] propose to do something about it." Second Tr. at 68:7-24 (Moss). El Paso Electric stated that the FERC understands the need for certainty, but that its rules and regulations are a "balancing act [] and FERC is the one who is striking that balance." Second Tr. at 68:19:22 (Moss); Second Tr. at 69:13-15 (Moss). El Paso Electric warned the Court that Great Divide is trying to "get [the Court] to override the existing FERC rules and create some quasi[-]rule." Second Tr. at 69:15-17 (Moss).

Next, the Court heard from the Commissioners. See Second Tr. at 69:23-24 (Court). The Commissioners began by stating that they would like to counter several Great Divide statements. See Second Tr. at 69:25-70:2 (Amer). First, the Commissioners restated El Paso Electric's argument that rule 570 is a "valid implementation of PURPA" because it "balances the interests of QFs and utility customers." Second Tr. at 70:2-5 (Amer). The Commissioners reminded the Court that the rule's restriction is "almost identical" to the restriction from the Power Resource Group rule that the Fifth Circuit upheld. Second Tr. at 70:9-14. The Commissioners also argued

that Great Divide's reliance on Order No. 69 is misplaced because that order was written in the 1980s, and that the parties should instead look to the Notice of Proposed Rulemaking to understand the FERC's interpretation of PURPA. See Second Tr. at 70:16-19 (Amer). The Commissioners then contended that Great Divide misinterpreted rule 570 because New Mexico "has never required that there be assigned interconnection agreement nor has New Mexico ever required that the QF actually be interconnected." Second Tr. at 71:2-10 (Amer). The Commissioners pointed out the FERC struck down a rule that did require an interconnection agreement only a month before it declined to act on WWPP. Second Tr. at 71:22-72-10. While the Commissioners acknowledged that a notice not to act does not mean the FERC has upheld the rule, the Commissioners stated that the notice not to act can imply that the rule "was not so extreme or so blatant [] on its face wrong that FERC needed to strike [it] down," and, consequently, the same implication can be made about Great Divide case. Second Tr. at 72:10-17 (Amer). The Commission next turned to the 2012 rulemaking and counters Great Divide's assertion that the Notice of Proposed Rulemaking is an admission of an invalid PURPA implementation. See Second Tr. at 72:24-25 (Amer). The Commissioners observed that "the utility staff of the PRC recommended that the [C]ommission vacated the 2012 hearing" because "[t]hey specifically stated at that time in 2012 [that] nothing had changed with PURPA and there was nothing wrong with the [C]ommission's rule." Tr. 73:5-9 (Amer). The Commissioners also stated that the New Mexico Attorney General and the New Mexico Industry Energy Consumers filed a joint statement that rule 570 did not require an amendment at the time. See Tr. 73:9-16 (Amer). The Commissioners then repeated their request from their motion to disqualify former

Commissioner Jason Marks, because he conducted a rule hearing that Great Divide used as support for the proposition that the original rule was invalid.  See Second Tr. at 74:1-15 (Amer).

The Commission then stated that "thousands" of New Mexican homeowners have self-certified as QFs without having to submit anything to the FERC and, consequently, these homeowners have been granted the right to sell their power to the utility and to receive "net meter training."  Second Tr. at 74:18-76:22 (Amer, Court, Moss).  The Commissioners underscored the balance that they are trying to strike in their PURPA implementation plan, a balance that they say the "FERC is trying to achieve now through some of its proposed changes." Second Tr. at 77:9-15.  To further emphasize this point, the Commissioners pointed to a footnote that described how prices and rates for power and energy impact consumers.  See Second Tr. at 78:3-79:9 (Amer).  SPS then offered to give the Court a QF report.  See Second Tr. at 79:15-17. The Court inquired as to whether any QFs in its report were similar to Great Divide, and SPS responded that, though most of the QFs are homeowners, one QF is a solar facility that is interconnected with their system.  See Second Tr. at 79:13-80:5 (Lees, Court).  Great Divide countered that the QFs in that report are "in a different situation from EPE because [] they're in an organized market" and that SPS' comments do not "change any of the arguments here." Second Tr. at 81:2-8 (Guy).

Great Divide attempted to respond to the Commissioners' argument about interest-balancing, but the Court redirected it to focus on "where is the [regulation and] statute that [say] what New Mexico is doing is unlawful."  Second Tr. at 82:11-23 (Guy, Court).  Great Divide stated that the regulations make clear in the preamble that prescribed rules must encourage QFs.  See Second Tr. at 83:12-23.  Great Divide said that the "question is what is the

state doing that's running afoul of the requirements." Second Tr. at 83:23-25 (Guy). The Court clarified with the Commission that PURPA's purpose is to promote "small power production," and not necessarily to promote QFs. Tr. 84:2-14 (Court, Moss). The Commissioners explained that there are two types of QFs: (i) cogeneration facilities, which are gas-fired; and (ii) small power productions, "which are typically classified as renewables." Second Tr. 84:15-20. The Commission clarified that PURPA was meant to encourage the second type of QF, small power productions. See Second Tr. 84:20-22 (Moss).

Great Divide emphasized that "Congress told FERC . . . to encourage QFs, small production facilities," and that the FERC provided States with the requirements that encourage small production facilities, including the provision that entitles QFs to a legally enforceable obligation with a utility. Second Tr. at 85:24-86:6 (Guy). Great Divide stated that because the legally enforceable obligation arises only when a utility declines to do business with a QF, a rule allowing the utility to only "do business with a qualifying facility when a qualifying facility is connected and the qualifying facility is already doing business with [the utility]" cannot be reconciled with a rule entitling a QF to a legally enforceable obligation before the start of a specified term. Second Tr. at 86:8-25 (Guy). The Court asked whether Great Divide's theory would require the Court "not to believe what the FERC is saying," which is that the FERC does not have rules. Second Tr. 87:3-5 (Court). Great Divide stated that the FERC's regulations can be squared with Great Divide's theory, but that States cannot impose a limit that contradicts specific regulations. See Second Tr. 87:6-15 (Guy). The Court pressed Great Divide to answer whether the FERC says it does not have regulations. See Second Tr. at 87:17-18 (Court). Great Divide said the FERC has regulations, but that the FERC said to defer to State's reasonable

implementation of those regulations, and that rule 570 is not a reasonable implementation of those regulations. See Second Tr. at 87:12-24 (Guy). The Court asked Great Divide if the FERC cases concluding States' limitations are reasonable are a stumbling block to Great Divide's argument. See Second Tr. at 87:25-88:3. Great Divide disagreed that those cases are a stumbling block and distinguishes those cases from the present case by stating that "those cases all stand for the proposition where the state has meaningful[ly complied] and reasonably implemented the requirements." Second Tr. at 88:17-19 (Guy).

The Court asked Great Divide what regulation rule 570 violates. See Tr. at 88:22-24. Great Divide responded that rule 570 violates 16 C.F.R. 292.304(d), "because that is the [regulation] that requires that every QF, including unconstructed QFs are entitled to an LEO." Second Tr. at 89:2-5. (Guy). The Court asked Great Divide its thoughts on the FERC, saying that 18 C.F.R. § 292.304(d) "provides that a QF can choose to have its rates based on avoided costs calculated at the time of delivery or at the time [a legally enforceable obligation] is [established. H]owever PURPA regulation do not specify when or how [a legally enforceable obligation] is established." Second Tr. at 89:10-15 (Court). Great Divide responded negatively "because what the FERC is saying there is . . . the context . . . of every QF not being constructed. Everything you're reading in this [] rule is in the context of a QF that is yet to be constructed." Second Tr. at 89:17-21 (Guy).

Great Divide reiterated that it wants the Court to conclude that the NMPRC's implementation plan "contradicts" and "is violative of the statute as written." Second Tr. at 90:4-7 (Guy). Great Divide emphasized that the language "that requires something that happens before [a QF is] constructed" cannot be reconciled with the "position that says a [QF has to have]

take[n] office already doing business with [a utility] before [a QF] can get a[n] obligation to do business with [a utility]." Second Tr. at 91:1-6 (Guy). Great Divide points out to the Court that Order 69 says that the NMPRC supports a recommendation that States should not be unregulated. See Second Tr. at 91:11-14 (Court). Great Divide emphasized that it is not saying QFs can demand a legally enforceable obligation at any time, nor is it "saying the rule is such that they have to encourage everybody . . . [but rather that] if you implement [a] rule you have to do it in a common sense, reasonable, objective way that satisfies the balancing . . . but doesn't discourage cogeneration and small power production." Tr. 92:1-11.

In contrast, Great Divide argued, the Commissioners' rule actively discourages cogeneration and small power production. See Second Tr. 93:1-14 (Guy). Great Divide repeated that the Court is not bound by the Fifth Circuit. See Second Tr. 92:15-17 (Guy). It reiterated that the FERC has "held that an LEO can take effect before a contract is executed, and may not necessarily be incorporated into a contract.'" Second Tr. 93:11-14 (Guy). Great Divide took issue with the previous contention that New Mexico's rule is on the spectrum of reasonableness "because there is nothing about their rule which requires fully developed and constructed facilities that could be . . . understood to mean that it is encouraging the development of these facilities." Second Tr. 94:6-11 (Guy). Great Divide then summarized all its arguments, concluding with a request that the court "say that [what the Commissioners are doing] is invalid because it conflicts with the statute," the regulations, Order No. 69, and the specialized agency charged with enforcing the statute. Second Tr. at 94:13-95:2 (Guy). The Court indicated that it was inclined to deny the motion for summary judgment but that it would "take a hard look" and write an opinion. Second Tr. at 96:13-21 (Court).

15.     **The Minute Order.**

The Court wrote a Minute Order requesting that the parties brief it on two issues: (i) whether mandator purchase requirement exemptions listed in 18 C.F.R. § 292.309 are comprehensive; and (ii) the definition of "available energy" in the Order No. 69 sentence: "Each electric utility is required under section 210 to offer to purchase available electric energy from cogeneration and small power production facilities which obtain qualifying status under section of PURPA." Minute Order, filed on October 11, 2019 (Doc. 84)(text-only entry)(quoting Order No. 69, 45 Fed. Reg. 12,215.) Great Divide filed its response to the Minute Order on October 16, 2019 (Doc. 85)("Great Divide's Letter to the Court"). Defendants filed a joint response to the Minute Order on October 16, 2019 (Doc. 86)("Defendants' Letter to the Court")

Great Divide responded to the Court's first question by clarifying that: "The criteria set forth in 18 C.F.R. § 292.309 (and section 292.310, which procedurally implements section 292.309), are the exclusive list of exemptions from the PURPA purchase obligation." Great Divide's Letter to the Court at 2 (citing Swecker v. Midland Power Coop., 253 F. Supp. 3d 274, 276)(D.D.C. 2017)). Great Divide responded to the Court's second question by stating that "Section 210 of PURPA does not define the term 'available electric energy' but does direct FERC to prescribe rules encouraging QF development and to 'require electric utilities to offer to purchase . . . electric energy from such facilities." Great Divide's Letter to the Court at 2-3 (quoting Order No. 69, 45 Fed. Reg. 12,215). Great Divide then reminded the Court that "Section 292.303 cannot be read as limiting the right of QFs to elect the creation of a long-term legally enforceable purchase obligations under Section 292.304(d) only to those QFs which are

already constructed and interconnected to a utility, by agreement, and thus be able to begin sales." Great Divide's Letter to the Court at 3.

Defendants responded to the Court's first question by explaining that the exemptions from the mandatory purchase requirements "apply only to utilities that: (1) meet certain criteria specified by the Federal Energy Regulatory Commissions [], and (2) apply for and receive FERC approval to cease purchasing the output of qualifying facilities." Defendants' Joint Letter to the Court at 1 (citing 18 C.F.R. § 292.310). Defendants then elaborate that the exemptions are not the only exemptions from the mandatory purchase obligation because "other parts of the FERC regulations grant exemptions from the mandatory purchase obligation in certain circumstances." Defendants' Joint Letter at 1. The Defendants answer the second question by stating that, while "neither PURPA nor the FERC regulations 'available electric energy,'" the phrase "suggests that the small power production facility must be constructed and be ready to be interconnected before the purchase obligation arises because the QF's electric energy is not available [before construction.]" Defendants' Joint Letter at 2.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v.

Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u> *Celotex*, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[20] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland

---

[20]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court of the United States of America, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided. See 184 F. Supp. 3d at 1067, 1073, 1075, 1079. The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." 184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1). Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment. See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v.

Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence, however, will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote

omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'"  *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake City, 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake City,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v.*

*Miller*, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the

blatant contradictions of the record must be supported by more than other witnesses' testimony."

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499

F. App'x 771 (10th Cir. 2012).

## LAW REGARDING PURPA AND THE RELATED FERC REGULATIONS

Congress enacted PURPA in the late 1970s to encourage the development of alternative energy sources. See F.E.R.C. v. Mississippi, 456 U.S. 742, 756-57 (1982). Concerns about the United States' lagging domestic oil market and recent energy scarcities fueled Congress' interest in alternative resources. See F.E.R.C. v. Mississippi, 456 U.S. at 756-57. See also Michael D. Hornstein & J.S. Gebhart Stoermer, The Energy Policy Act of 2005: Purpa Reform, the Amendments and Their Implications, 27 Energy L.J. 25, 25-26 (2006)(describing PURPA as "the Carter administration's response to the energy crises of the 1970s, most notably the Middle East oil embargo of 1973-74 and a second oil 'shock' in 1977" (footnote omitted)). The United States relied on foreign oil, faced shortages in natural gas, and had experienced increases in electricity costs. See F.E.R.C. v. Mississippi, 456 U.S. at 756. See also Richard D. Cudahy, PURPA: The Intersection of Competition and Regulatory Policy, 16 Energy L.J. 419, 421 (1995)(stating that PURPA responded to "dramatic and severe shortages of oil and natural gas and skyrocketing prices of almost every form of energy [that had] prompted public concern"; "the Arab oil embargo [that] interdict[ed] supplies from the Middle East"; "an intense desire to reduce dependence on foreign oil (and on fossil fuels generally) and to diversify technologies used for the generation of electricity"; and the desire to encourage alternative electricity generation through renewable resource "because of the painful scarcity of oil and natural gas and environmental and safety objections to coal and nuclear power" (footnote omitted)); Jim Rossi & Thomas Hutton, Federal Preemption and Clean Energy Floors, 91 N.C. L. Rev. 1283, 1306 (2013)("In the five years prior to PURPA's enactment, natural gas and oil -- which together accounted for about one third of the electricity generation portfolio -- had increased in cost by

175% and 400%, respectively." (footnote omitted)); Rohit C. Sharma, <u>Niagara Mohawk Power Corp. v. FERC</u>, 23 Energy L.J. 157, 157 (2002)("PURPA was intended by Congress to combat a nationwide energy crisis by promoting long-term economic growth by reducing the nation's reliance on oil and gas and to encourage development of alternative energy sources."). Congress confronted an electricity industry that used a higher percentage of energy in the country than it produced. <u>See</u> <u>F.E.R.C. v. Mississippi</u>, 456 U.S. at 756. The Supreme Court of the United States of America describes in detail the background against which Congress legislated:

> Committees in both Houses of Congress noted the magnitude of the Nation's energy problems and the need to alleviate those problems by promoting energy conservation and more efficient use of energy resources. <u>See</u> S. Rep. No. 95-442, at 7-10; H.R. Rep. No. 95-543, vol. I, pp. 5-10 (1977); H.R. Rep. No. 95-496, pt. 4, pp. 3-7, 125-130 (1977). Congress was aware that domestic oil production had lagged behind demand and that the Nation had become increasingly dependent on foreign oil. <i>Id.</i>, at 3. The House Committee observed: "Reliance upon imported oil to meet the bulk of U. S. oil demands could seriously jeopardize the stability of the Nation's economy and could undermine the independence of the United States." <i>Ibid.</i> <u>See</u> H.R. Rep. No. 95-543, vol. I, at 5-6. Indeed, the Nation had recently experienced severe shortages in its supplies of natural gas. <i>Id.</i>, at 7. The House and Senate Committees both noted that the electricity industry consumed more than 25% of the total energy resources used in this country while supplying only 12% of the user demand for energy. S. Rep. No. 95-442, at 7-8; H.R. Rep. No. 95-496, pt. 4, at 125. In recent years, the electricity utility industry had been beset by numerous problems, <i>id.</i>, at 129, which resulted in higher bills for the consuming public, a result exacerbated by the rate structures employed by most utilities. S. Rep. No. 95-442, at 26. Congress naturally concluded that the energy problem was nationwide in scope, and that these developments demonstrated the need to establish federal standards regarding retail sales of electricity, as well as federal attempts to encourage conservation and more efficient use of scarce energy resources. <u>See</u> <i>id.</i>, at 24-32; H.R. Rep. No.95-496, pt. 4, at 131-133, 136-138, 170-171.

> Congress also determined that the development of cogeneration and small power production facilities would conserve energy. The evidence before

Congress showed the potential contribution of these sources of energy: it was estimated that if proper incentives were provided, industrial cogeneration alone could account for 7%-10% of the Nation's electrical generating capacity by 1987. S. Rep. No. 95-442, at 21, 23.

F.E.R.C. v. Mississippi, 456 U.S. at 756-57.

PURPA amends portions of the Federal Power Act, 16 U.S.C. §§ 791a, 792, 793, 796-818, 820-23, 823a-23g, 824, 824a-824j, 824j-1, 824k, 824p-24w, 825, 825a, 825p, 824q-1, 825r, and, more importantly for this litigation, adds provisions to encourage the development of nontraditional energy facilities. See Stanley A. Martin, Problems with PURPA: The Need for State Legislation to Encourage Cogeneration and Small Power Production, 11 B.C. Envtl. Aff. L. Rev. 149, 157 (1983). Through the additional provisions, Congress attempted to address two specific factors that it believed inhibited the nontraditional energy industry. See F.E.R.C. v. Mississippi, 456 U.S. at 750-51. The problems were the reluctance of "traditional electricity utilities" "to purchase power from, and to sell power to, the nontraditional facilities," and the "financial burdens" that state and federal utilities authorities imposed on the nontraditional facilities through energy regulations. F.E.R.C. v. Mississippi, 456 U.S. at 750-51. See Cudahy, supra, at 422 ("A major problem confronting both cogeneration and energy from renewable sources was that the electric utilities comprised almost the only market for electricity from these alternative energy sources. And the utilities, for various reasons -- including cost -- were reluctant to purchase power from their potential competitors."); Steven Ferrey et. al., Fire and Ice: World Renewable Energy and Carbon Control Mechanisms Confront Constitutional Barriers, 20 Duke Envtl. L. & Pol'y F. 125, 140 (2010)(listing concerns that Congress addressed through PURPA); Ben Raker, Decentralization and Deference: How Different Conceptions of

Federalism Matter for Deference and Why That Matters for Renewable Energy, 47 Envtl. L. Rep. News & Analysis 10963, 10965 (2017)(explaining that energy utilities at the time of PURPA's passage sold and produced power and preferred more consistent power sources than renewable energy facilities, which relied on "fickle" energy resources, so hesitated to purchase power from other, nontraditional energy companies).  To address the first concern, Congress required the FERC to establish rules that require electric utilities to sell electric energy to and purchase electric energy from nontraditional energy facilities -- the qualifying facilities.  See 16 U.S.C. § 824a-3.  Congress directs the FERC that the rates which electric utilities pay to purchase electric energy and at which electric utilities sell electric energy "shall be just and reasonable to the electric consumers of the electric utility and in the public interest," and "shall not discriminate against qualifying cogenerators or qualifying small power producers."  16 U.S.C. § 824a-3(b)-(c).  The electric energy purchasing rates must not exceed "the cost to the electric utility of the electric energy which . . . such utility would generate or purchase from another source" had the electric utility not purchased from the qualifying facility.  16 U.S.C. § 824a-3(d).  See Hornstein & Gebhart Stoermer, supra, at 30 ("PURPA created a market for the power generated by QFs [(qualifying facilities)] by requiring electric utilities to purchase energy generated by QFs and by instructing the FERC to promulgate rules to ensure that the rates for such purchases are just and reasonable and do not discriminate against QFs.").  To resolve the second concern, Congress asked the FERC to create regulations exempting the non-traditional energy sources from specified federal and state regulations.  See 16 U.S.C. § 824a-3(e)(1).

PURPA protects two forms of QFs.  See 16 U.S.C. § 824a-3.  The first form -- a "cogeneration facility" -- produces "(i) electric energy, and (ii) steam or forms of useful energy

(such as heat) which are used for industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796(18)(A). See 16 U.S.C. § 824a-3(l). Cogeneration, for instance, preserves heat -- thermal energy -- from a system that creates energy and uses that heat for another purpose. See Cogeneration, Wikipedia, https://en.wikipedia.org/wiki/Cogeneration (last visited October 11, 2019). In a combined heat and power plant, that other purpose might, for example, be for heating. See Cogeneration, supra. A cogeneration facility becomes qualified for PURPA's purposes on the filing of "a notice of self-certification" with the FERC unless exempted from the requirement, 18 C.F.R. § 292.203(b)(2); see 16 U.S.C. § 824a-3(l), and on meeting the FERC's output, efficiency, and use standards, see 16 U.S.C. § 824a-3(l); 18 C.F.R. § 292.203(b)(1); 18 C.F.R. § 292.205(a), (b), (d).

The second form of a QF -- a "[s]mall power production facility" -- "produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof." 16 U.S.C. § 796(17)(A). See 16 U.S.C. § 824a-3(l). This category includes, for instance, wind farms, dams, and solar energy facilities. See 16 U.S.C. § 796(17)(A). Congress limits PURPA's benefits to those facilities producing no more than eighty megawatts of energy at their sites. See 16 U.S.C. § 796(17)(A). See 16 U.S.C. § 824a-3(l). A small power production facility meets the FERC's requirements for qualification on producing less than eighty megawatts, see 16 U.S.C. § 824a-3(l); 18 C.F.R. § 292.203(a)(1); 18 C.F.R. § 292.204(a)(1); deriving seventy-five percent or more of its energy input from "biomass, waste, renewable resources, geothermal resources, or any combination thereof," 18 C.F.R. § 292.204(b)(1)(i); see 16 U.S.C. § 824a-3(l); 18 C.F.R. § 292.203(a)(2); and filing a

"notice of self-certification" unless exempted from such filing, 16 U.S.C. § 824a-3(l).  See 18

C.F.R. § 292.203(a)(3); 18 C.F.R. § 292.207.

In implementing PURPA, the FERC enacted prescriptions that address the unique

challenges facing nontraditional energy sources.  See 18 C.F.R. § 292.304(d).  The FERC

provides that electric utilities may purchase electric energy from qualifying facilities either as the

energy becomes available for purchase or "pursuant to a legally enforceable obligation."[21]  18

C.F.R. § 292.304(d).  The FERC understands that investors in new technology need certainty in

their returns.  See FERC Order No. 69, 45 Fed. Reg. at 12,224.  Energy utilities that purchase

pursuant to a legally enforceable obligation may pay at the qualified facilities' choice either

"[t]he avoided costs," i.e., the cost to the electric utility of the energy that the utility would

_____

[21]The FERC's regulations provide:

Each qualifying facility shall have the option either:

(1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or

(2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

    (i)     The avoided costs calculated at the time of delivery; or

    (ii)    The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d).

generate or purchase from another source, calculated on delivery, or "[t]the avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2). In allowing the option to have the energy utility pay the long-term avoided cost, FERC contemplates "contractual commitments based, by necessity, on estimates of future avoided costs." FERC Order No. 69 at 12,224.

The statutory scheme in 16 U.S.C. § 824a-3 at the same time grants the States considerable authority in PURPA's field and constricts considerably States' authority in that field. See 16 U.S.C. § 824a-3(f); F.E.R.C. v. Mississippi, 456 U.S. at 759 (describing 16 U.S.C. § 824a-3(f) as "troublesome" because it requires States to implement FERC's regulations). Congress leaves implementation of the FERC regulations at the State level to the States but requires that the States implement the regulations that FERC passes. See 16 U.S.C. § 824a-3(f). Deirdre O'Callaghan and Steve Greenwald recount that, in enacting PURPA,

> [t]he federal government identified and prioritized problems related to a matter of significant national interest (domestic energy supplies versus dependence on foreign oil) controlled at least in part by matters principally left to the states (retail rate regulation of public utility companies), and required the states to address matters central to these problems, but permitted them to do so in widely varying ways with widely varying results.

Deirdre O'Callaghan & Steve Greenwald, PURPA from Coast to Coast: America's Great Electricity Experiment, Nat. Resources & Env't 17 (Winter 1996)(characterizing PURPA as "one of the grand policy experiments of our generation"). States have "'great latitude in determining the manner of implementation of the Commission's rules, provided that the manner chosen is reasonably designed to implement the requirements' of FERC regulations." Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 385 (FERC Order No. 69, 45 Fed. Reg. at 12230-31). A

State may, for instance, implement PURPA and the FERC regulations through rulemaking or by adjudicating disputes that arise under the rules.  See Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 385 (citing F.E.R.C. v. Mississippi, 456 U.S. at 759-60).

PURPA provides two means by which a party may challenge a state action in implementing or not implementing PURPA and the FERC regulations.  See 16 U.S.C. § 824a-3(g)-(h).[22]  The means applicable to the case depends on the challenge that the party brings.  See 16 U.S.C. § 824a-3(g)-(h).  A party bringing an as-applied challenge to a state's actions under PURPA must bring the challenge in a state court, which have exclusive jurisdiction.[23]  See 16 U.S.C. § 824a-3(g).  See also Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 235; Windway Techs., Inc. v. Midland Power Co-op., No. C00-3089MWB,

---

[22]These provisions apply equally to nonregulated electric entities, on which PURPA imposes the same requirements to create rules implementing the PURPA and the FERC regulations that PURPA places on States. See 16 U.S.C. § 824a-3(f)-(h).

[23]Section 824a-3(g) of Title 16 of the United States Code directs that a party may obtain judicial review of state regulatory actions in the same circumstances that a party may obtain judicial review under 16 U.S.C. § 2633.  See 16 U.S.C. § 824a-3(g).  Section 2633 of Title 16 of the United States Code limits federal jurisdiction over cases to review of determinations that a federal agency made:

> Any person (including the Secretary) may obtain review in the appropriate court of the United States of any determination made under subchapter I or II or this subchapter by a Federal agency if such person (or the Secretary) intervened or otherwise participated in the original proceeding or if otherwise applicable law permits such review. Such court shall have jurisdiction to grant appropriate relief. Any person (including the Secretary) may bring an action to enforce the requirements of subchapter I or II or this subchapter with respect to any Federal agency in the appropriate court of the United States and such court shall have jurisdiction to grant appropriate relief.

16 U.S.C. § 2633.

2001 WL 1248741, at *4 (N.D. Iowa Mar. 5, 2001)(Bennett, J.).   A party bringing an as-implemented challenge to a state's actions must bring the challenge first in an enforcement action before the FERC.  See 16 U.S.C. § 824a-3(h)(2)(B).  See also Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 235; Niagara Mohawk Power Corp. v. F.E.R.C., 306 F.3d 1264, 1269 (2d Cir. 2002); Indus. Cogenerators v. F.E.R.C., 47 F.3d 1231, 1234 (D.C. Cir. 1995).  If the FERC does not initiate an enforcement action within sixty days or declines to initiate an action, the party may bring the challenge before a federal court.  See 16 U.S.C. § 824a-3(h)(2)(B).  See also Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 235; Indus. Cogenerators v. F.E.R.C., 47 F.3d at 1234.  Only a federal court has jurisdiction to hear an as-implemented claim; a state court lacks such jurisdiction.  See 16 U.S.C. § 824a-3(h)(1) (directing that rules implemented under PURPA should be treated as rules enacted under the Federal Power Act); 16 U.S.C. § 825m (describing that the FERC challenges to rules enacted pursuant to the Federal Power Act are brought in federal courts); 16 U.S.C. § 825p (giving federal district courts exclusive jurisdiction over claims regarding violations of rules enacted under the Federal Power Act); 16 U.S.C. § 824a-3(h)(2)(B) (identifying federal district courts as the forum to bring claims challenging implementation of PURPA).  See also Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 235; Indus. Cogenerators v. F.E.R.C., 47 F.3d at 1234.

"'An implementation claim involves a contention that the state agency . . . has failed to implement a lawful implementation plan under § 824a-3(f) of the PURPA.'"  Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 235 (alterations in Power Res. Grp., Inc. v. Klein)(quoting Power Res. Grp., Inc. v. Klein, 2004 U.S. Dist. LEXIS 28820, at *16 (alterations

in Power Res. Klein)). The category of as-implemented challenges includes more than contentions that a state agency has not acted to implement PURPA and the FERC regulations; a party may contend in an as-implemented claim that a state's actions to implement the laws violate PURPA and the FERC regulations. See 16 U.S.C. § 824a-3(h)(1); Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 388-95; Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 239; N.Y. State Elec. & Gas Corp. v. F.E.R.C., 117 F.3d 1473, 1476 (D.C. Cir. 1997); Swecker v. Midland Power Coop., No. 4:13-CV-00250-JEG, 2013 WL 11311233, at *4 (S.D. Iowa Dec. 30, 2013)(Gritzner, J.), aff'd sub nom. Swecker v. Midland Power Coop., 807 F.3d 883 (8th Cir. 2015); JD Wind 1, L.L.C. v. Smitherman, No. A-09-CA-917-SS, 2010 WL 3703119, at *5-7 (W.D. Tex. Sept. 14, 2010)(Hulme, J.); Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 494 F. Supp. 2d 401, 409-11 (M.D. La. 2007)(Brady, J.); N.Y. State Elec. & Gas Corp. v. Saranac Power Partners L.P., 117 F. Supp. 2d 211, 242 (N.D.N.Y. 2000)(Mordue, J.), aff'd, 267 F.3d 128 (2d Cir. 2001). PURPA permits suits when a state fails to implement the FERC regulations in accordance with 16 U.S.C. § 824a-3(f)(1)'s requirements, and most courts treat a failure to comply with PURPA and the FERC regulations as such a failure to implement. See 16 U.S.C. § 824a-3(f)(1), (h)(1); Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 388-95 (assuming that a state regulatory action violating PURPA and the FERC regulation can form the basis for an as-implemented claim); Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 239 (same);[24] N.Y. State Elec. & Gas Corp. v. F.E.R.C., 117 F.3d at 1476 ("The failure

_____

[24]Although the Fifth Circuit did not reach a holding on jurisdiction in Power Resources Group Inc. v. Public Utility Commission of Texas, 422 F.3d at 239, and instead summarized the district court's conclusions about jurisdiction under PURPA, see 422 F.3d at 235-36, in Exelon

of a state commission to ensure that a rate does not exceed a utility's avoided cost is a failure to comply with a regulation implementing the PURPA."); Swecker v. Midland Power Coop., 2013 WL 11311233, at *4 (assuming that as-implemented challenges arise when a PURPA or FERC regulation violation occurred); JD Wind 1, L.L.C. v. Smitherman, 2010 WL 3703119, at *5-7 (assuming that as-implemented challenges apply to perceived violations of PURPA); Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 494 F. Supp. 2d at 409-11 (assuming that a party raises an as-implemented challenge by arguing about purported PURPA violations); N.Y. State Elec. & Gas Corp. v. Saranac Power Partners L.P., 117 F. Supp. 2d at 242 ("Since [New York State Electric and Gas Co.] complains herein about [New York Public Service Commission's] inconsistency with both PURPA as well as FERC's regulations, it asserts the existence of district court jurisdiction pursuant to PURPA Section 210(h)(2)(A)."). Accord Indep. Power Producers of N.Y., Inc., 80 FERC ¶ 61125, 61397 (July 30, 1997)("We have interpreted this section to encompass 'situations where State regulatory authorities . . . are alleged to . . . have promulgated regulations which are inconsistent with or contrary to the Commission's regulations.'" (quoting FERC Policy Statement at 61,644)). Contra Mass. Inst. of Tech. v. Mass. Dep't of Pub. Utils.,

---

Wind 1, L.L.C. v. Nelson, the Fifth Circuit adopted all the statements about jurisdiction it made in Power Resources Group Inc. v. Public Utility Commission of Texas as precedential and confirmed that, in Power Resources Group Inc. v. Public Utility Commission of Texas, the Fifth Circuit would have reached the same conclusions as the district court had the Fifth Circuit reached a holding, see Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 393 ("[A]ssuming *arguendo* that we were not bound by the jurisdictional determination in *Power Resource III*, we would conclude that the delineation drawn by the district court in *Power Resource II* between implementation and as-applied challenges is a persuasive reading of PURPA's text, and would follow the same approach here.").

941 F. Supp. at 237 ("In this case, the state agency -- [Massachusetts Department of Public Utilities ('MDPU')] -- has devised an implementation plan.  It follows that MDPU has fulfilled its obligation to implement, as defined in the FERC opinion, because MDPU has "enact[ed] laws or regulations at the State level.").

As-implemented challenges attack rules or practices of general applicability for violating PURPA or the FERC regulations.  See, e.g., Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 393; Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 233; Winding Creek Solar L.L.C. v. Peevey, 293 F. Supp. 3d at 983; Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 494 F. Supp. 2d at 409-11; N.Y. State Elec. & Gas Corp. v. Saranac Power Partners L.P., 117 F. Supp. 2d at 219, 242.  In a paradigmatic as-implemented challenge, a party asks a court to conclude that a rule that a state agency adopts through a regulation, notice, or similar means, violates PURPA and the FERC regulations.  See, e.g., Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 393; Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 233; Winding Creek Solar L.L.C. v. Peevey, 293 F. Supp. 3d at 983.  In Exelon Wind 1, L.L.C. v. Nelson, the Fifth Circuit reasoned that claims challenging a PUCT rule's lawfulness were as-implemented challenges where, in the claims, the facility "ask[ed] for a declaration that," contrary to the PUCT rule, "all Qualifying Facilities may form Legally Enforceable Obligations, and request[ed] that the court issue an injunction requiring the PUC[T] to fully implement FERC's regulations." 766 F.3d at 393.  The Fifth Circuit added that "[e]ither form of relief would necessarily require the PUC[T] to alter its current rules."  Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 393.  Likewise, in Power Resource Group, Inc. v. Public Utility Commission of Texas, wherein the PUCT "determined that because its rules implementing PURPA provide for a legally enforceable

obligation only if a facility is within ninety days of delivering power, [the electric utility in the case] had no obligation to purchase power from [the QF]," Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 233, the Fifth Circuit upheld the district court's determination that whether the rule properly implemented PURPA was an as-implemented challenge, see 422 F.3d at 236. Accord Winding Creek Solar L.L.C. v. Peevey, 293 F. Supp. 3d at 983 (assuming that a claim that CPUC orders creating a Renewable Market-Adjusting Tariff program violated PURPA and the FERC regulations was an as-implemented challenge).

Courts have likewise deemed claims that challenge a state agency's established methodology for calculating avoided cost rates to raise as-implemented challenges. See N.Y. State Elec. & Gas Corp. v. F.E.R.C., 117 F.3d at 1476 ("The alleged failure of the [New York Public Service Commission] to set the contested rates at [New York State Electric & Gas Corp.'s] avoided cost would ordinarily be challenged through an enforcement action brought in district court under [16 U.S.C. § 824a-3(h)]."); N.Y. State Elec. & Gas Corp. v. Saranac Power Partners L.P., 117 F. Supp. 2d at 219, 242 (concluding that an energy utility brought an as-implemented challenge where it argued that the New York Public Service Commission's "generic guidelines" for calculating a utility's avoided costs resulted in the energy utility entering contracts for energy at a rate that violated PURPA). In Occidental Chemical Corp. v. Louisiana Public Service Commission, for instance, wherein a plaintiff argued "that[,] by approving the new methodology for calculating avoided costs, the [Louisiana Public Service Commission] has failed to faithfully implement the rules prescribed by the FERC, as required by federal law," and alleged that the Louisiana Public Service Commission systemically underestimated avoided costs and failed to implement PURPA's definition of avoided costs, the

Honorable James Brady, then- United States District Judge for the Middle District of Louisiana, concluded that the plaintiff raised as-implemented challenges. Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 494 F. Supp. 2d at 409-11. Judge Brady relied on the Fifth Circuit's reasoning in Power Resource Group, Inc. v. Public Utility Commission of Texas and concluded that the plaintiff's complaints affected entities other than solely the petitioner. See Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 494 F. Supp. 2d at 411.[25]

"'An as-applied claim involves a contention that the state agency's . . . implementation plan is unlawful, as it applies to or affects an individual petitioner.'" Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 235 (alterations in Power Res. Grp., Inc. v. Klein)(quoting Power Res. Grp., Inc. v. Klein, 2004 U.S. Dist. LEXIS 28820, at *16). As-applied claims include those claims in which a party contests how a state agency applied the state's regulations to the party. See Mass. Inst. of Tech. v. Mass. Dep't of Pub. Utils., 941 F. Supp. at 237-38 (concluding that a qualified facility brought an as-applied claim where the facility argued that it should be immune from a regulation based on its status as a qualified

---

[25]Where a plaintiff sues a nonregulated electric utility, a claim that the electric utility's rate schedules and calculations violate PURPA is an as-implemented claim. See Swecker v. Midland Power Coop., 2013 WL 11311233, at *4 (concluding that a QF brings an as-implemented challenge where a QF asks the defendant to change the methodology for calculating all rates -- a request that applies to all qualifying facilities); ConocoPhillips Co. v. Dep't of Water & Power, City of L.A, 2008 WL 11422174, at *3-4 (treating claims that rate schedules violate PURPA and the FERC regulations as as-implemented challenges). Contra Windway Techs., Inc. v. Midland Power Coop., 2001 WL 1248741, at *6 (concluding that the plaintiffs raised an as-applied challenge where the plaintiffs argued that the tariffs that the defendant applied to them violated PURPA, but "explicitly state[d] that the present action is not an action to enforce PURPA" and did not seek to enforce PURPA, but rather "insist[ed] that this [was] an action for damages, alleging as one of the predicate acts causing such damages a violation of the PURPA").

facility).  In Power Resource Group, Inc. v. Public Utility Commission of Texas, for instance, the Fifth Circuit upheld the district court's dismissal of a claim wherein a QF requested injunctive relief from a PUCT order interpreting and applying a PUCT rule requiring, for a legally enforceable obligation to begin, a qualified facility to be capable of providing energy within ninety days of notifying the electric utility that the QF could deliver power.  See Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 234, 236, 239.  See also Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 393.

In Exelon Wind 1, L.L.C. v. Nelson, the Fifth Circuit similarly declined to interpret a challenge to a PUCT order as an as-implemented claim.  See 766 F.3d at 390-91.  The Fifth Circuit explained that

> Exelon asked the district court for a declaration that the PUC[T] Order did not implement FERC's Regulation and is preempted. . . . Exelon also asked the district court to declare that the PUC[T] must reopen Exelon's proceedings for further consideration, and to issue an injunction prohibiting the PUC[T] from enforcing the PUC[T] Order.

766 F.3d at 390.  The Fifth Circuit described these challenges as "'contention[s] that the state agency's . . . implementation plan is unlawful, as it applies to or affects an individual petitioner'" that were "thus as-applied challenges over which we have no jurisdiction."  766 F.3d at 390 (quoting Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex., 422 F.3d at 235).  The Fifth Circuit focused on the PUCT decision's language:

> The [administrative law judge] found that wind-generated power is not readily available.  The Commission disagrees with this broad statement encompassing all wind-generated power.  The Commissioners note that disparate wind patterns in the diverse geographic regions of the state can result in significantly different characteristics for wind-generated power.  Further combining wind with energy

storage techniques or other energy sources, like solar energy, can also result in significant differences.

Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d at 390-91. The Fifth Circuit stated regarding the language: "The PUC[T] thus left open the possibility that other wind generators might be able to comply with the firm power requirement, either through technological advances or based on their locations in regions with more predictable wind patterns than those found around the Exelon facilities." 766 F.3d at 391. The Fifth Circuit reasoned that

> the fact that as-applied challenges may establish precedent relevant to future cases does not transform them into facial or implementation challenges. Courts routinely adjudicate as-applied constitutional challenges to statutes; these decisions do not become facial challenges simply because of their *stare decisis* effect in future cases presenting similar facts or legal theories.

766 F.3d at 391. Contra JD Wind 1, L.L.C. v. Smitherman, 2010 WL 3703119, at *4-7 (concluding that a QF alleging an as-implemented challenge where the facility argued that the PUCT's order concluding that a wind facility could not create a legally enforceable obligation "due to the intermittent availability of wind" violated PURPA).

## ANALYSIS

Unless federal law – either law from the Supreme Court of the United States, legislation, or regulations -- precludes a State from regulating a utility in a particular way, the federal court does not have the power to find a State's regulations of a utility invalid. NMPRC implements PURPA[26] and its FERC regulations[27] through its case-by-case adjudication and through rule 570.

---

[26]PURPA Section 210, which is the statute's relevant part, provides "cogeneration and small power production rules." 16 U.S.C § 824a-3(a). PURPA states that the rates electric

17.9.570.9 OBLIGATION TO PURCHASE:

     A.     Each utility shall purchase power from a qualifying facility from the date of interconnection at the utility's avoided cost. An electric utility is obligated to purchase power from a qualifying facility at the utility's avoided cost regardless of whether the electric utility making such purchase is simultaneously selling power to the qualifying facility.

---

utilities pay to purchase electric energy and at which they sell electric energy "shall be just and reasonable to the electric consumers of the electric utility and in the public interest," and "shall not discriminate against qualifying cogenerators or qualifying small power producers." 16 U.S.C. § 824a-3(b)-(c). PURPA states that these rates for purchasing electric energy must not be greater than "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a-3(d). PURPA provides its benefits to two types of qualifying facilities: (i) cogeneration facilities, and (ii) small power production facilities. See 6 U.S.C. § 824a-3(l).

[27]The FERC implemented PURPA in 18 C.F.R. § 292.304(d):

     Each qualifying facility shall have the option either:

     (1) To provide energy as the qualifying facility determines such energy o be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or

     (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

          (i) The avoided costs calculated at the time of delivery; or

          (ii) The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d). The FERC also implemented PURPA through Order No. 69.

B. The qualifying facility shall give the utility at least sixty (60) days written advance notice to interconnect. Such notice shall specify the date the qualifying facility will be ready for interconnection, the date the qualifying facility will be able to commence testing, and the anticipated date of operation after testing. The qualifying facility shall pay the estimated costs of interconnection in full at the time the notice to interconnect is given. The utility shall pay a qualifying facility for any energy produced during testing of the qualifying facility at the appropriate energy rate pursuant to Subsection B of 17.9.570.11 NMAC.

Rule 570. PURPA requires States to implement it and its FERC regulations: "1) through the enactment of laws or regulations at the State level; 2) by application on a case-by-case basis by the State regulatory authority . . . or 3) by any other action reasonably designed to implement [FERC's' rules"]) Policy Statement Regarding the Commission's Enforcement Role under Section 210 of the Pub. Utility Reg. Policies Act of 1978, 23 FERC P 61,304, 1983 WL 39627 (May 31, 1983)("PURPA Policy Statement"). The FERC gives States "great latitude" to implement PURPA and the FERC regulations, FERC Order No. 69, 45 Fed. Reg. at 12,230, as long as their implementation plans are "reasonably designed," PURPA Policy Statement. See FERC v. Mississippi, 456 U.S. 751, 751 (1982). The NMPRC elected to implement PURPA and its FERC regulations though rule 570's promulgation, and through case-by-case adjudication of rule 570 challenges. See Great Divide's MSJ at 15. Section 292.304(d), which is at issue in this case, ensures that "each qualifying facility shall have the option to provide energy" either "as available" or "pursuant to a legally enforceable obligation . . . at the option of the qualifying facility exercised prior to the beginning of the specified term." 18 C.F.R. § 292.304(d)(1)-(2). This provision entitles QFs to sell their energy to utilities by either entering into a contract or by establishing a legally enforceable obligation. See Power Resource Group at 6 (citing FERC Regulations, 45 Fed. Reg. at 12,223). The FERC enacted the "legally enforceable obligation"

provision to "prevent a utility from circumventing the requirement that provides capacity credit for an eligible qualifying facility merely by refusing to enter into a contract with the qualifying facility." FERC Regulations at 12,223.

I. **NMPRC'S IMPLEMENTATION PLAN IS CONSISTENT WITH PURPA'S LANGUAGE AND ITS FERC REGULATIONS.**

PURPA ensures that "each qualifying facility shall have the option to provide energy" either "as available" or "pursuant to a legally enforceable obligation . . . at the option of the qualifying facility exercised prior to the beginning of the specified term." 18 C.F.R. § 292.304(d)(1)-(2). First at issue is language "each" and "shall." 18 C.F.R. § 292.304(d). Great Divide argues that this language is imperative and that rule 570, therefore, is inconsistent with the regulations, because rule 570's ready-to-interconnect requirement means that QFs who are not ready to establish a connection are unable to establish a legally enforceable obligation. See Great Divide's MSJ at 15 (quoting 18 U.S.C. § 292.304(d)(2)). While "each" and "shall" may appear to allow all QFs to establish legally enforceable obligations whenever they would like, the FERC's regulations clarify that this language is not a mandate. First, the meaning of "shall" has no legal consensus.[28] The FERC's regulations indicate that it does not interpret "shall" to mean "must." Scattered throughout the FERC regulations are exceptions and

---

[28]See Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434 (1995)("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.' See D. Mellinkoff, Mellinkoff's Dictionary of American Legal Usage 402–403 (1992) ('shall' and 'may' are 'frequently treated as synonyms' and their meaning depends on context); B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995)('[C]ourts in virtually every English-speaking jurisdiction have held—by necessity—that *shall* means *may* in some contexts, and vice versa.'")).

qualifications that demonstrate that the FERC interprets PURPA as allowing exceptions to the legally-enforceable-obligation requirement. See 18 U.S.C. § 292.301(b)(1)-(2) (stating that the requirements do not supersede contracts and do not limit the parties' ability to negotiate a contract with terms different than those that PURPA requires); FERC Order No. 69, 45 Fed. Reg. 12,217 (interpreting 18 U.S.C. § 292.301(b)(1)-(2) to not "preclude negotiated agreements" or "affect the validity of any contract" between a QF and a utility); FERC Order No. 69, 45 Fed. Reg. at 12,215 (stating that utilities are obligated "under Section 210 to offer to purchase *available* electric energy" from QFs)(emphasis added); id. at 12,219 (stating that the FERC interprets Section 210(a) "to impose on electric utilities an obligation to purchase all electric energy and capacity *made available* from" QFs). While the FERC has not acknowledged an exception similar to the one at issue, its allowances for exceptions indicate the language is not mandatory, as Great Divide believes. Furthermore, the FERC regulations' qualifications that a legally enforceable obligation requires utilities to purchase "available energy" is consistent with the ready-to-connect requirement at issue.[29]

_____

[29]The Court requested briefing on this "available energy" qualification that appears in the FERC regulations. The parties agreed that there is no formal definition available in the FERC's regulations. The Court agrees, however, with the Defendants' argument that the phrase "supports the conclusion that States have the right to require that a QF be able to produce energy before a purchase obligation arises." Letter from the Defendants to the Court, filed October 16, 2019 (Doc. 86)("That is, if each 'electric utility is required under section 210 to offer to purchase available electric energy,' as the FERC said in Order No. 69, the energy has to be available and ready for immediate use before the purchase obligation arises, or else the word 'available' is superfluous."). The contention that rule 570 'is more generous' than the FERC does not convince the Court, but the Court concludes that the 'available electric energy' language is consistent with rule 570. Letter from the Defendants to the Court at 3-4. Because the FERC has not regulated in this area and delegated implementation to the States, a State could be more generous by having no prerequisites to the establishment of a legally enforceable obligation.

Moreover, PURPA's language is meant to *"generally* require[] a utility to purchase a [QF's] electric output." FERC Order No. 69 45 Fed. Reg. at 12,215 (emphasis added). It does not, however, restrict the States from placing additional, "reasonably designed" requirements that fit into the State's "ongoing programs," and "economic and regulatory circumstances." FERC Order No. 69, 45 Fed. Reg. at 12231. The FERC includes "generally" to indicate that there may be exceptions to the utility's obligation to purchase energy. Because the FERC does not interpret the words "each" and "shall" to mean that all QFs, without exception, can establish a legally enforceable obligation, the NMPRC's decision to add a prerequisite is consistent with PURPA and its FERC regulations.

Furthermore, the Commissioners' implementation of the ready-to-interconnect prerequisite is consistent with PURPA, because PURPA is "silent" on when a legally enforceable obligation is established, a decision that the FERC has left "up to the states." El Paso Electric's Response at 10. The FERC has not restricted the States from placing additional, "reasonably designed" requirements that fit into the state's "ongoing programs," and "economic and regulatory circumstances." FERC Order No. 69, 45 Fed. Reg. at 12231. The FERC has not defined what constitutes "reasonably designed" requirements in the context of when a QF can establish a legally enforceable obligation. In its proposed rulemaking, the FERC states that "PURPA regulations do not specify when or how a LEO is established. To date, the Commission has not identified specific criteria that a state must follow in determining when a LEO is established." Notice of Proposed Rulemaking for Qualifying Facility Rates and Requirements Implementation Issues Under the Public Utility Regulatory Policies Act of 1978, 168 FERC ¶ 61, 84 Docket Nos. RM19-15-000 and AD16-16-000 85-86, at ¶ 134 (Sept. 19,

2019)("FERC Proposed Rulemaking").  Because the FERC has not yet regulated in this area and has given great latitude to the States in their implementation of PURPA and its FERC regulations, this area is open to the States' reasonable interpretation. The ready-to-interconnect requirement, therefore, is consistent with the FERC's regulations as they currently stand.  If the FERC executes its plan to "provide guidance for states as to what types of criteria may be applied to make the necessary demonstration of [a QF's commercial viability]," the Commissioners may find that its rule 570 violates PURPA and its FERC regulations.  See FERC Proposed Rulemaking ¶ 87, at 136.  Until FERC regulates in this area, however, its silence on appropriate prerequisites and its provision of great latitude to the States in implementing its regulations gives the Commissioners the wiggle room to implement a prerequisite.[30]

Second at issue is the phrase "prior to the beginning of a specified term." 18 C.F.R. § 292.304(d)(2).   Great Divide argues that NMPRC's implementation plan's ready-to-interconnect requirement "deprives QFs of the option to exercise their federal mandated right, 'prior to the beginning of the specified term,'" and is contrary, therefore, to 18 C.F.R. 292.304(d)'s language "prior to the beginning of the specified term."  Great Divide MSJ at 16 (quoting 18 C.F.R. § 292.304(d)).  Great Divide is presumably using "right" to refer to its right

---

[30]The FERC notes that, despite its lack of regulations in this area, it has found some prerequisites to be inconsistent with PURPA, namely the execution of a power purchase agreement or an interconnection agreement.  See FERC Proposed Rulemaking ¶ 135, at 86.  The execution of a power purchase agreement or an interconnection agreement is a more stringent requirement than ready-to-interconnect, so the Court concludes that the rejection of these prerequisites does not render necessary the rejection of the ready-to-interconnect prerequisite, especially given the FERC's plan to a commercial viability prerequisite indicates it will find some prerequisites appropriate.  See FERC Proposed Rulemaking ¶ 136, at 87.

to establish a legally enforceable obligation with a facility. Nonetheless, the right to establish a legally enforceable obligation with a facility is not implicated in the phrase "prior to the beginning of the specified term." 18 C.F.R. § 292.304(d). Before the beginning of the term is the time when a QF can choose when to calculate the avoided costs from two options: (i) "at the time of delivery"; or (ii) "at the time the obligation is incurred," and not the legally enforceable obligation's establishment. 18 C.F.R. § 292.304(d)(2)(i)-(ii).

Although the ready-to-interconnect prerequisite cabins the right to establish a legally enforceable obligation to only those QFs ready to interconnect, the requirement is still consistent with PURPA, because PURPA's text does not state that all QFs must be granted identical rights. Providing the right to ready-to-interconnect facilities may still encourage QFs' development. A facility that is ready to interconnect, but wants to delay the start date, can lock in a rate before the date the legally enforceable obligation is incurred. Order No. 69 at 45 Fed. Reg. 12,224. QFs that want price rate certainty in advance can elect to lock in the rate prior to the specified time period, and QFs that are willing to risk certainty for a higher rate have the ability to do so. Either way, QFs know that, as long as they are ready to interconnect, they will be able to contract with a utility. This advantage encourages QF development because, without the statute, they would not be able to guarantee a contractual obligation no matter the status of their readiness-to-interconnect.

Great Divide states that rule 570's ready-to-interconnect requirement conflicts with the FERC's statement that the "certainty regarding the future sale of . . . a QF's power output is needed 'before [the] construction of a facility' so that investors can estimate the expected return on a potential investment." Great Divide's MSJ at 16 (quoting FERC Order No. 69 at 12,218).

Great Divide is incorrect, because the FERC's regulations already provide certainty to QFs by mandating that utilities "provide data related to the costs of energy and capacity on the electric utility's system," and its "estimated avoided cost." FERC Order No. 69, 45 Fed. Reg. 12,218. This data is meant to assist "an investor" with "evaluat[ing] the financial feasibility of a cogeneration or small power production facility. . . before construction of a facility." FERC Order No. 69, 45 Fed. Reg. 12,218. An investor, therefore, has some certainty as to avoided cost rates and that certainty may incentivize investment. Moreover, Great Divide mistakenly conflates encouraging the development of QFs with encouraging the QFs' construction. While encouraging QFs' construction is one way to encourage their development, encouraging their development can be accomplished through other means. As the Court previously noted, QFs' that are ready to interconnect can force utilities to contract with them, which is an incentive for QFs to invest in their facilities' construction and expansion that QFs would not have otherwise.

Great Divide also argues that rule 570 conflicts with the FERC regulations' language that says that Congress intends PURPA to resolve QFs' need to enter into "contractual commitments based, by necessity, on estimates of future avoided costs." Great Divide's MSJ at 16 (quoting Order No. 69, 45 Fed. Reg. at 12,224). El Paso Electric counters that assertion by stating that the provision means that a QF can lock in estimated avoided costs, even if those estimated costs ultimately differ from the utility's actual avoided costs. El Paso Electric's Response at 17 (quoting Order No. 69, 45 Fed. Reg. at 12,224). After reading the provision in context, the Court concludes that El Paso Electric is correct, because the surrounding text clarifies that the FERC is justifying why its regulations permit "the avoided cost of energy at the time it is

provided" to be different than "the price provided in the contract and obligation."  Order No. 69, 45  Fed. Reg. at 12,224.

Furthermore, as discussed previously, the FERC anticipated exceptions to a utility's obligation to purchase power.  The FERC stated that Section 210 was meant to "remove the obstacle" that did not "generally require utilities to purchase the electrical output."  FERC Order No. 69, 45 Fed. Reg. at 12,215.  The logical opposite of "not generally required to purchase" is "generally required to purchase," so by removing the obstacle, the FERC is "generally requir[ing]" utilities to purchase energy.  FERC Order No. 69, 45 Fed. Reg. at 12,215.

## II.     CHANGES IN THE FERC'S COMPOSITION AND GOALS MAY EXPLAIN THE TENSION BETWEEN ITS PAST DECISIONS AND CURRENT PROPOSED RULEMAKING.

While the FERC makes it clear that it has yet to regulate prerequisites to legally enforceable obligations, see FERC Proposed Rulemaking ¶ 134, at 85, this statement is in tension with several of its past decisions where it struck down state implementation plans that required prerequisites to establishing legally enforceable obligations.  The causes of this tension, however, are distinguishable from the present case, and do not change the Court's conclusion that rule 570 is consistent with PURPA and its FERC regulations.   First, the requirements at issue in the previous cases are distinct from the requirement in the present case.  Both State agencies in FLS Energy, Inc., et. al. and Applied Energy Servs., Inc. v. Okla. Corp. Comm'n. required an executed agreement with a utility, which not only is more stringent than the ready-to-interconnect requirement, but also allows utilities to circumvent PURPA's requirements in contradiction to the FERC regulations.  See FERC Regulations at 12,223 (stating that the legally enforceable obligation provision was enacted to "prevent a utility from circumventing the

requirement that provides capacity credit for an eligible qualifying facility merely by refusing to enter into a contract with the qualifying facility"); <u>FLS Energy, Inc., et al.</u>, 157 FERC ¶ 61,211, at 20, 23-26; <u>Applied Energy Servs., Inc. v. Okla. Corp. Comm'n.</u> 31 FERC ¶ 61,313, at 61,709 (1985).  In a third FERC decision, <u>Grouse Creek</u>, the issue was whether a state commission could "reject an agreement between a qualifying facility and a utility as eligible for pre-December 14, 2019 published avoided cost rates."  El Paso Electric's Response at 5.  The issue is not analogous to the present case.  Moreover, Great Divide proffers the case as support for its conclusion that a legally enforceable obligation can predate a contract's formation and execution, but that conclusion is not contested in this case.  <u>See</u> MSJ at 17.

Second,  the FERC's composition and goals may explain the tension between the FERC's previous decisions striking down prerequisites to legally enforceable obligations and its current proposed rulemaking's clarification that it has not yet regulated in this area.  The FERC made these previous decisions between 2009 and 2016.  When the FERC published its proposed rulemaking in 2019, all three of its members had started their tenure in 2017 or 2018.[31]  <u>See About FERC: Commission Members</u>, FERC (last visited Nov. 2, 2019) https://www.ferc.gov/about/com-mem.asp.  In 2016, the FERC began to focus on legally enforceable obligations.  <u>See</u> Scott B. Grover, <u>PURPA Among Policies New FERC Commissioners Face</u>, Nat. Resources & Env't 54 (Fall 2017)("New FERC Commissioners

_____

[31]One of the Commissioners who joined the FERC in 2017, Robert Powelson, notably stated that "PURPA need[s] modernization 'to reflect the nation's 21st century energy landscape.'"  New FERC Commissioners Article at 54 (citing NARUC Follow-up on Energy Policy (Jan. 19, 2017), available at http://pubs.naruc.org/pub/370B232E-B047-86DA-AB04-ED41C10B7908).  Powelson stepped down from his position in 2018.

Article"). Later that year, the FERC held a technical conference, and many stakeholders and industry members submitted comments to the FERC. <u>See</u> New FERC Commissioners Article at 54. The FERC received criticism that its legally enforceable obligation requirement in PURPA had "outlived its usefulness," because "[e]nergy supply no longer faces the scarcity concerns that originally gave rise to the legislation, and the general facilities (and their development) . . . no longer need such uplift." New FERC Commissioners Article at 54. Accordingly, while the FERC may have been more likely to intervene when States implemented prerequisites to legally enforceable obligations, new membership and decreased urgency may explain why the FERC now wants to regulate required commercial viability before permitting the establishment of legally enforceable obligations. <u>See</u> FERC Proposed Rulemaking ¶ 141, at 90.

While the FERC's proposed rulemaking states that it does not plan for its proposed commercial viability requirements to be applicable to "QFs already in operation," because they "have necessarily demonstrated a commitment to construct the project," the FERC has said it is looking for comments on these requirements. FERC Proposed Rulemaking ¶ 141, at 90 ("[For commercial viability, S]tates may require a showing, for example, that a QF has satisfied, or is in the process of undertaking, at least some of the following prerequisites . . . . These indicia are not intended to be exhaustive and the Commission seeks comment on these indicia and others that also might be appropriate for consideration."). The only conclusions, therefore, that can be drawn from this section of the proposed rulemaking are: (i) the FERC has not yet regulated in this area; and (ii) Great Divide may be able to demonstrate a violation of the FERC regulations in the future, but this prediction is speculative and subject to change. <u>See</u> FERC Proposed Rulemaking 91 n.183.

The Court concluded that NMPRC's 2012 Notice of Proposed Rulemaking is not an admission of guilt. Great Divide argues that, because the NMPRC's proposed rulemaking sought to render rule 570 "consistent with federal and state law," that NMPRC's implementation plan is inconsistent with federal and state law. Great Divide's Reply at 31 (quoting In re Adoption of a Proposed Rule  Governing Cogeneration and Small Power Production, No. 12-00332-UT, Notice of Proposed Rulemaking (withdrawn Sept. 27, 2012)). The Court disagrees. First of all, the NMPRC's proposed rulemaking indicates that the NMPRC took its obligation to be consistent with federal law seriously. After the NMPRC proposed this rulemaking, several authorities provided their comments that the proposed rulemaking was unnecessary because the implementation plan was already consistent with  federal and state law. See Second Tr. 73-16 (Amer)(stating that PRC's utility staff recommended that the NMPRC vacate the 2012 hearing because rule 570 was not in violation of any laws and stating that the New Mexico Attorney General and the New Mexico Industry Energy Consumers filed a joint statement that rule 570 did not require amendment to be consistent with law after the proposed rulemaking). The Court does not see a reason that the proposed rulemaking and its subsequent withdrawal indicates anything more than the NMPRC wanting to ensure they were in compliance with the law, and then were assured they were in compliance with the law.

## III. THE COURT IS NOT THE APPROPRIATE VENUE TO ENCOURAGE QF DEVELOPMENT.

The Court acknowledges Great Divide's argument that no QFs have been constructed under the NMPRC's implementation plan. The NMPRC implemented rules that should have incentivized the development of qualifying facilities. Nevertheless, if more encouragement is

required to develop qualified facilities, the NMPRC and the FERC are the appropriate authorities to add encouragement. If FERC is dissatisfied with the NMPRC's results, it has the ability to "prescribe rules as the Commission determines necessary to encourage cogeneration and small power production." FERC Order No. 69, 45 Fed. Reg. at 12,215.

**IT IS ORDERED** that the Plaintiff's Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment, filed June 6, 2019 (Doc. 57) is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jason A. Marks
Jason Marks Law, LLC
Albuquerque, New Mexico

--and--

Adam Wenner
Cory Lankford
Jonathon Guy
Orrick, Herrington & Sutcliff, LLP
Washington, D.C.

     *Attorneys for the Plaintiffs*

Judith E. Amer
New Mexico Public Regulation Commission
Santa Fe, New Mexico

     *Attorney for the Defendants Theresa Becenti Aguilar, Cynthia Hall, Jefferson Byrd,*
       *Valerie Espinoza, and Stephen Fischmann*

Ron Moss
Winstead PC
Austin, Texas

--and--

Carol A. Clifford
Jerry Todd Wertheim
Jones, Snead, Wertheim & Clifford, P.A.
Santa Fe, New Mexico

> *Attorneys for the Defendant El Paso Electric Company*

Will DuBois
Zoe Elizabeth Lees
Xcel Energy Services, Inc.
Austin, Texas

> *Attorneys for the Intervenor Southwestern Public Service Company*